John A. **BARCO**, Petitioner,

v.

James E. **TILTON**, Warden, Respondent.

Case No. CV 07–7163–AG (RNB).

United States District Court, C.D. California.

Feb. 2, 2010.

Conrad Petermann, Conrad Petermann Law Offices, Ojai, CA, for Petitioner.

Robert M. Snider, CAAG–Office of Attorney General of California, Los Angeles, CA, for Respondent.

ORDER ADOPTING FINDINGS, CONCLUSIONS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE

ANDREW J. GUILFORD, District Judge.

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition, all the records and files herein, and the Report and Recommendation of the United States Magistrate Judge. Objections to the Report and Recommendation have been filed herein. Having made a *de novo* determination of those portions of the Report and Recommendation to which objections have been made, the Court concurs with and adopts the findings, conclusions and recommendations of the Magistrate Judge.

IT THEREFORE IS ORDERED that Judgment be entered granting a conditional writ of habeas corpus as follows:

Unless petitioner is brought to retrial within sixty (60) days of the date the Judgment herein becomes final (plus any additional delay authorized under State law), respondent shall discharge petitioner from all adverse consequences of his conviction

in Los Angeles County Superior Court Case No. KA069089.

### REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

ROBERT N. BLOCK, United States Magistrate Judge.

This Report and Recommendation is submitted to the Honorable Andrew J. Guilford, United States District Judge, pursuant to the provisions of 28 U.S.C. § 636 and General Order 194 of the United States District Court for the Central District of California.

### PROCEEDINGS

On November 1, 2007, petitioner (through counsel) filed a Petition for Writ of Habeas Corpus by a Person in State Custody herein, along with a supporting Memorandum of Points and Authorities ("Pet. Mem."). In accordance with the Court's Order Requiring Response to Petition and following two extensions of time, respondent filed an Answer to Petition, along with a supporting Memorandum of Points and Authorities on February 19, 2008. Due to the attachment of an incorrect document, respondent filed an Amended Answer ("Amd. Ans.") along with a supporting Memorandum of Points and Authorities ("Amd. Ans. Mem.") on February 22, 2008. Petitioner filed a Traverse ("Trav.") thereto on March 10, 2008. The matter was set for a status conference on April 3, 2008 to address an exhaustion issue relating to that portion of Ground two challenging a jury instruction on ex post facto grounds, and to discuss development of the record as to Ground one, an ineffective assistance of counsel claim. At that status conference, petitioner elected to withdraw that portion of Ground two

that the Court had found unexhausted, and the Court, after consultation with the parties, set dates for the parties to file a number of documents in preparation for an evidentiary hearing on petitioner's ineffective assistance of counsel claim. The Court held a number of status conferences prior to the evidentiary hearing, and ruled on the admissibility of evidence that the parties proposed to present at the evidentiary hearing. The evidentiary hearing was held on May 28 and 29, 2009 and July 24, 2009. Each party called a number of witnesses. At the request of counsel, the Court issued a tentative ruling on the ineffective assistance of counsel claim on September 14, 2009 and heard argument from the parties regarding the tentative ruling on September 25, 2009.

Thus, this matter now is ready for decision. For the reasons discussed hereafter, the Court recommends that the Petition be granted with respect to petitioner's ineffective assistance of counsel claim.

### PROCEDURAL HISTORY

On September 2, 2005, a Los Angeles County Superior Court jury found petitioner guilty of first degree murder, two counts of shooting at an inhabited dwelling, conspiracy to commit the crimes of murder and shooting at an inhabited dwelling, and attempted murder. (*See* 2 Clerk's Transcript on Appeal ["CT"] 424–29; 5 Reporter's Transcript on Appeal ["RT"] 1833–36). The jury also found true the allegations that a principal in the murder, conspiracy to commit murder, and attempted murder was armed with a firearm within the meaning of Cal.Penal Code § 12022(a)(1), and that the attempted murder was willful, deliberate, and premeditated. (*See* 2 CT 424, 428–29; 5 RT 1833–36).[1] On January 23, 2006, the trial court

---

1. Petitioner's co-defendant was found guilty of the same crimes, and additional sentence enhancement allegations based on his personal use of a gun were found to be true. (*See* 2 CT 418–423; 5 RT 1825–31).

sentenced petitioner to state prison for an indeterminate term of 26 years-to-life plus a consecutive term of life with the possibility of parole plus four months. (*See* 3 CT 740–41; 5 RT 2129–30).

Petitioner appealed his conviction and sentence to the California Court of Appeal raising *inter alia* claims generally corresponding to Grounds one and three and partially corresponding to Ground two of the Petition herein, and joining in his co-defendant's opening brief on appeal. Petitioner concurrently filed a petition for writ of habeas corpus in the Court of Appeal raising a claim generally corresponding to Ground one raised in the petition herein. (*See* Respondent's Notice of Lodgment ["Lodgment"] Nos. A–1, B–1). In an unpublished decision filed on June 20, 2007, 2007 WL 1765424, the California Court of Appeal reversed petitioner's (and his co-defendant's) conviction of conspiracy to shoot at an inhabited dwelling, but otherwise affirmed the judgment. (*See* Amd. Ans., Exhibit ["Exh."] C). The Court of Appeal issued a separate order denying petitioner's habeas petition on the basis that "the record fails to establish that petitioner was denied the effective assistance of counsel." (*See* Amd. Ans., Exh. E). Petitioner's ensuing Petition for Review to the California Supreme Court raising the same claims raised in the Court of Appeal was denied on September 25, 2007, without comment or citation of authority. (*See* Lodgment No. B–2; Amd. Ans., Exh. D).

On June 25, 2007, petitioner filed a habeas petition in the California Supreme Court raising a claim generally corresponding to Ground one raised in the Petition herein. (*See* Lodgment No. B–3).

The California Supreme Court denied that petition without comment or citation of authority on September 25, 2007. (*See* Amd. Ans., Exh. E).

## SUMMARY OF THE EVIDENCE PRESENTED AT TRIAL

██ Since petitioner is not contesting the sufficiency of the evidence to support his conviction, the following summary is taken from the "Factual Background" section of the California Court of Appeal opinion (*see* Amd. Ans., Exh. C at 29–35):[2]

### *The prosecution's evidence*

#### *Assault on Johnny Barco*

*In August 2004, Johnny, [petitioner's] son, went with two friends to a party to which they were not invited, at the home of Rashaun (Rashaun) and Vicky (Vicky) Ware (collectively, the Wares), in West Covina. When a large number of uninvited people arrived, Rashaun told them to leave, and a fight ensued. Rashaun was struck by a bottle. Johnny was attacked by several people, left on the street, and hit by a car as partygoers hurriedly left the residence after hearing a gunshot.*

*As a result of the attack, Johnny suffered life threatening injuries, including a severed thumb, broken pelvis, three broken vertebrae, numerous cuts and bruises and a footprint embedded on his face by a kick. He was hospitalized for one and one-half or two months, remaining in a coma for some time.*

**2.** The Court notes that recent Ninth Circuit cases have accorded the factual summary set forth in an opinion of the California Court of Appeal a presumption of correctness pursuant to 28 U.S.C. § 2254(e)(1). *See Slovik v. Yates,* 545 F.3d 1181, 1183 n. 1 (9th Cir.2008); *Moses v. Payne,* 555 F.3d 742, 746 n. 1 (9th Cir.2009); *Tilcock v. Budge,* 538 F.3d 1138, 1141 (9th Cir.2008); *Mejia v. Garcia,* 534 F.3d 1036, 1039 n. 1 (9th Cir.2008). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. Here, petitioner has not attempted to do so. *See Tilcock,* 538 F.3d at 1141.

### The Barco Family

In November 2003, [Luis] Gutierrez began dating Inisha Barco (Inisha), [petitioner's] daughter. Some time afterwards, [Alex] Guerrero, Inisha's ex-boyfriend and father of her three-year-old daughter, moved in with Inisha. He then moved out of Inisha's residence and later into Barco's residence. Gutierrez moved in with Inisha four or five months after they began dating and remained there until they broke up in February 2005. Gutierrez socialized at the Barco residence almost daily and got along well with the family. At the time of the assault on Johnny, [petitioner] and his wife, Marivel, Guerrero, Johnny, and Johnny's siblings, Nathan and Vanessa resided at [petitioner's] residence. While Johnny was hospitalized, his family worried he would die. His parents and siblings, and then live-in boyfriend, Gutierrez, visited him daily.

### Investigation of Johnny's beating

Detective Dario Aldecoa investigated the assault on Johnny for several weeks, but was unable to locate any witnesses who could, or would, identify Johnny's assailants. Johnny could not be interviewed due to his injuries. For two months after the assault, [petitioner] telephoned the detective daily, sometimes two to four times a day, to learn the case status. [Petitioner] had heard from Johnny's friends that Rashaun was involved in the assault, which he told the detective more than once. Rashaun's photograph was included in a lineup, but neither Johnny's friends who attended the party with him nor any other partygoers selected him as a suspect. [Petitioner] expressed frustration with the inability to make arrests.

In November 2004, [petitioner], Marivel, and Johnny went to the police station to view photographs of Rashaun and others. Johnny could not identify anyone. With no witness identifications, Detective Aldecoa told [petitioner] the investigation was being suspended, but that [petitioner] could sue Rashaun civilly and apply for monetary benefits through the victim rights office. This was Detective Aldecoa's last contact with [petitioner].

### The December 21, 2004 shooting

On December 21, 2004, at approximately 10: 00 p.m., the Wares were preparing for bed when they heard gunshots. Rashaun went to his daughter, Larissa's, room which faced the street, and carried her to his bedroom. There, the Wares noticed that she had been shot in the chest. Vicky called 911 and carried the telephone outside screaming hysterically. She dropped to the ground as additional shots were fired. Three or four feet from her, she saw a small white car drive away. She could not see the driver, and neither she nor Rashaun saw defendants during the shooting.

The shooting left the rear window of the Wares's Ford Explorer shattered. A small tire iron that had broken the dining room window was found on the dining room table. Bullets also went through the dining room and kitchen windows. Larissa died at the hospital of the gunshot wound.

Neighbors and passers-by heard the shots at the Wares' house and saw a white car, variously described by them as an older Nissan or Toyota, an older white, four-door car without hubcaps, a white economy car and a "90's type model of a Toyota or Honda." Antoinette Caro ran to her window and saw someone, wearing a dark, hooded sweatshirt and dark jeans run from the Wares' house to a white car, drive away, and return and fire more shots. She could not identify the driver. Ernesto Diaz heard gunshots, went outside and saw flashes coming from inside a white car. Marc Day (Day) saw the driver of the car, whom he described as a male Hispanic, with a moustache, wearing a baseball cap. Judy Lopez heard shots and

went outside where she heard a second volley of shots. Dean Vanderheyden (Vanderheyden), a reserve police officer, heard four or five gunshots and went outside, returned to his house and heard a second round of shots. He went outside again and saw a white car making a rapid exit. Only Vanderheyden reported seeing a second person in the car.

### Guerrero's arrest

On December 21, 2004, shortly after the shooting, Deputy Sheriff Henri Floris responded to a drive-by shooting call. He spotted a white, four-door Toyota Corolla, with a burned out taillight, speeding and making an illegal turn. He stopped the Toyota, two or three miles from the crime scene, approached it, and found Guerrero wearing a hooded sweatshirt and black gloves. The two front windows of the car were open.

Deputy Floris conducted a patdown search of Guerrero and recovered a cell phone, small shards of glass from Guerrero's front pocket, a plastic baggie containing six bullets and, on the passenger seat, a black gun, with one live round, four spent casings and one empty cylinder. There was a single bullet sitting on the driver's seat and an empty baggie on the floorboard on the driver's side and one in the driver's door.

After the shooting, police transported the witnesses to look at the white car that Guerrero had been driving. Each indicated that the car looked like the car involved in the shooting. Vanderheyden identified Guerrero as the driver. Day did not identify Guerrero to police that night but did in court, although he was uncertain.

### Investigation of the shooting

On December 22, 2004, at 5:45 a.m., West Covina Police Department Sergeant, David Melnyk, went to the Barco residence to discuss the shooting. [Petitioner] said that he played pool and drank beer with Guerrero the prior evening.[3] [Petitioner] went to sleep at approximately 9:00 p.m. He also told officers that he never heard Guerrero talk about retaliation for the attack on Johnny. He agreed to give the Sergeant the key to his daughter's car, which had been parked in front of the house for three weeks, but the key could not be located.

Ballistics tests determined that the revolver recovered from the car Guerrero was driving fired the bullets that struck Larissa and were found at the scene. Telephone records indicated that the cell phone confiscated from Guerrero received a 24–second call from the Barco residence at 9:09 p.m.

On March 3, 2005, Detective Steve Wheeless searched the Barco residence armed with arrest warrants for [petitioner], Inisha and Johnny. A 25–caliber handgun was recovered from a nightstand next to the bed in the master bedroom. In a bedroom closet, the detective found a newspaper with a second page article on the assault of Johnny. Johnny was released a day later and could not be located before trial.

### Trial testimony regarding conspiracy

#### Gutierrez's contradictory testimony

It was at the hospital that a plan to retaliate by shooting Rashaun was conceived, according to Gutierrez who provided the only evidence of such a plan.[4] Gu-

---

**3.** Vanessa told police that Guerrero did not drink.

**4.** The morning after the planned shooting, Gutierrez, who was then living with Inisha, lied to police and told them that he knew nothing about the shooting. But in February 2005,

after he had broken up with Inisha and moved out of her apartment, and the day after she had him arrested for attempting to reenter, he called Detective Aldecoa and reported [petitioner's] involvement in the crime. Gutierrez claimed that he went to the police out of a guilty conscience, having nothing to do with Inisha's having him

tierrez testified that during hospital visits, [petitioner] often talked in front of his family and Guerrero about retaliating against whoever hurt his son. [Petitioner] blamed the owner of the house where the party occurred, whose name was mentioned several times.

After Johnny was released from the hospital, Gutierrez testified that [petitioner's] talk of retaliation continued. He told household members that he wanted to kill Rashaun at Rashaun's home, just before Christmas, so it would be a "big thing." [Petitioner] drew a map of Rashaun's neighborhood and said that he wanted multiple drive-by-shootings. The first would wake the family and rouse them out of bed. The second would strike the then standing Ware family members who would be easier targets. [Petitioner] wanted more than one shooter and two different cars. He would drive around looking for police in the area and advise the other car when the coast was clear. Gutierrez and Guerrero were to do the shooting, for which [petitioner] offered them money. [Petitioner] mentioned the plan to Gutierrez several times in the presence of family members and was encouraged by Johnny and Inisha. Guerrero and Inisha suggested using Inisha's white Toyota Corolla.

Gutierrez testified that he told [petitioner] he would be the shooter, but claimed at trial that he was merely pretending he would do so. In contradiction, he also testified that he went along with [petition-

er's] planning, but never said he would participate. He testified that he lied to [petitioner] about doing the shooting because he feared him. He told Inisha that he was not going to participate. Until confronted with a copy of the police report, he did not recall telling police that he had agreed to participate in the drive-by shooting.[5] He never made any suggestion and was merely present when others spoke about the plans.

Gutierrez testified that a few months before the shooting, [petitioner] told him to obtain guns. While Gutierrez testified that he did not respond yes or no, he said he shook his head up and down. He also testified both that he did not purchase any gun and that he did.[6] He explained that he did not look for a gun, but told police that in November he mentioned to a neighbor, Ray Valentine (Valentine), a "Cholo" gang member, about the assault on Johnny. Valentine offered to sell him a gun to retaliate, and even offered to do the shooting. In Gutierrez's presence, Inisha purchased an AK–47 rifle from Valentine for $300 or $400.[7] Gutierrez denied intending to revenge the assault on Johnny, buying the gun, being in the car, and having anything to do with the shooting.

At [petitioner's] request, two or three months before the shooting, Gutierrez brought the rifle to [petitioner's] garage and showed him how to load it. He did so because he feared [petitioner], who had threatened him in the past, had a temper, and indicated he was connected with the Mexican Mafia.[8] Gutierrez left the rifle

arrested, although nothing prevented him from telling the story earlier. At the time he went to the police, they had offered him nothing, but in exchange for this truthful testimony, he was later granted immunity for his role in the shooting.

5. When Gutierrez met with police in February 2005, he "indicated that [he] went along with [petitioner's] plan and agreed to participate in the drive-by shooting."

6. Gutierrez told police that he purchased the unregistered assault rifle.

7. The AK–47 was not the weapon used in the shooting at the Wares' residence.

8. Gutierrez testified that he knew [petitioner] was a teacher at Don Lugo High School and taught part-time in prisons and at the California Youth Authority. He also testified that that did not make sense in light of [petitioner's] alleged Mexican Mafia connection.

in the garage, retrieving it approximately a month later because [petitioner] wanted it kept at Gutierrez's apartment. After the shooting, Gutierrez returned it to the Barco house.

Gutierrez testified that on the night of the shooting he was home with Inisha. He did not know the shooting was going to occur that night. After the shooting, he spoke with [petitioner] who was angry Guerrero had been arrested and upset that Gutierrez did not do the shooting. When Gutierrez mentioned that Rashaun's daughter had died, [petitioner] said he was glad that Rashaun would see how it feels.

### Juan Avalos's testimony

A friend of Gutierrez, Juan Avalos, testified that in November 2004, Gutierrez told him he was having problems with Inisha. He also said that [petitioner] wanted him to retaliate, but he was not going to do so. Gutierrez told Avalos, his ex-girlfriend, Veronica Preciado, and his mother that he was frightened and that if anything happened to him, it was [petitioner].

### Vanessa Barco's testimony

Vanessa testified that she never heard her father say he was upset that someone injured Johnny or indicate that he was going to retaliate. She did hear [petitioner] become upset when Gutierrez brought a loaded rifle into their home. [Petitioner] was a high school teacher and taught inmates in state prison and at the California Youth Authority.

### The defense evidence

[Petitioner] called no witnesses.

Guerrero called Detective Aldecoa. He testified that it appeared from the evidence that the shooter first broke the window of the Wares' Ford Explorer and then went towards the house and threw the small tire iron into the dining room window. He then returned to the lawn and fired the first volley that struck the house as he was moving. The bullets entered the house on an upward trajectory. Vicky was standing just inside the yard when the second group of shots was fired. It appears that these were fired from inside the vehicle.

### PETITIONER'S CLAIMS

1. Petitioner was denied his Sixth Amendment right to the effective assistance of counsel by his attorney's failure to investigate and produce readily available evidence that refutes the claim that petitioner had conspired in any way in the crimes charged; that manifests petitioner's character for non-violence; and that readily portrays a Luis Gutierrez not seen by the jury, one who has committed numerous crimes of moral turpitude, and manifested a readiness to violently retaliate and a motive to retaliate against the Barco family by falsely accusing petitioner of the crimes charged. (*See* Pet. Mem. at 25–78; Trav. at 2–7).

2. Petitioner was denied his federal constitutional right to due process by the denial of his state created right that the jury be instructed that an accomplice's testimony must be viewed with caution and corroborated by sufficient evidence. (*See* Pet. Mem. at 78–84; Trav. at 7–12).

3. The motive instruction provided to the jury vitiated the reasonable doubt standard and thereby reduced the prosecution's burden of proof in violation of petitioner's right to due process. (*See* Pet. Mem. at 86–90; Trav. at 13).

### STANDARD OF REVIEW

The standard of review applicable to petitioner's claims that were not the subject of the evidentiary hearing [9] is set forth

---

**9.** The standard of review applicable to petitioner's ineffective assistance of counsel claim is discussed in the Section III(B), *infra*.

in 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"):

> "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings."

■ Under the AEDPA, the "clearly established Federal law" that controls federal habeas review of state court decisions consists of holdings (as opposed to dicta) of Supreme Court decisions "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *see also Carey v. Musladin*, 549 U.S. 70, 74, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006); *Smith v. Patrick*, 508 F.3d 1256, 1260 (9th Cir.2007).

■ Although a particular state court decision may be both "contrary to" and "an unreasonable application of" controlling Supreme Court law, the two phrases have distinct meanings. *See Williams*, 529 U.S. at 391, 413, 120 S.Ct. 1495. A state court decision is "contrary to" clearly established federal law if the decision either applies a rule that contradicts the governing Supreme Court law, or reaches a result that differs from the result the Supreme Court reached on "materially indistinguishable" facts. *See Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam); *Williams*, 529 U.S. at

405–06, 120 S.Ct. 1495. When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." *Williams*, 529 U.S. at 406, 120 S.Ct. 1495. However, the state court need not cite or even be aware of the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8, 123 S.Ct. 362.

■ State court decisions that are not "contrary to" Supreme Court law may only be set aside on federal habeas review "if they are not merely erroneous, but 'an *unreasonable* application' of clearly established federal law, or are based on 'an *unreasonable* determination of the facts.'" *Early*, 537 U.S. at 11, 123 S.Ct. 362 (citing 28 U.S.C. § 2254(d) and adding emphasis). A state court decision that correctly identified the governing legal rule may be rejected if it unreasonably applied the rule to the facts of a particular case. *See Williams*, 529 U.S. at 406–10, 413, 120 S.Ct. 1495 (*e.g.*, the rejected decision may state *Strickland* rule correctly but apply it unreasonably); *Woodford v. Visciotti*, 537 U.S. 19, 24–27, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam). However, to obtain federal habeas relief for such an "unreasonable application," a petitioner must show that the state court's application of Supreme Court law was "objectively unreasonable." *Visciotti*, 537 U.S. at 24–27, 123 S.Ct. 357; *Williams*, 529 U.S. at 413, 120 S.Ct. 1495. An "unreasonable application" is different from an erroneous or incorrect one. *See Williams*, 529 U.S. at 409–10, 120 S.Ct. 1495; *see also Visciotti*, 537 U.S. at 25, 123 S.Ct. 357; *Bell v. Cone*, 535 U.S. 685, 699, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002).

## DISCUSSION

### I. *Habeas relief is not warranted with respect to petitioner's due process claim based on the failure to instruct the jury regarding the need for corroboration of accomplice testimony.*

#### A. *The record below*

At the conclusion of the prosecution's case, petitioner's counsel made a motion pursuant to Cal.Penal Code § 1118.1,[10] arguing that there had been no corroboration of Luis Gutierrez's account, or in the alternative, if there had been corroboration, it was not sufficient corroboration. (*See* 4 RT 1295). The trial court denied the motion, reasoning:

> "I think there's a substantial issue as to whether or not Mr. Gutierrez is, in fact, an accomplice; and the jury is going to be instructed as to the criteria that is required in order to make one an accomplice. His testimony suggests he was a feigned accomplice. Moreover, if the jury makes a determination that he is an accomplice, I think there are several items in evidence that may have a tendency to connect [petitioner]." (*See* 4 RT 1295).

During a conference regarding the jury instructions the following day, outside the presence of the jury, co-defendant's counsel inquired whether the trial court intend-

ed to instruct the jury with CALJIC Nos. 3.15[11] and 3.16.[12] The trial court responded:

> "3.15 I made reference yesterday in addressing your 1118 motion something about feigned offers, and I was totally wrong on that as far as its application. And I do not intend to give that instruction. I think what I really meant in the ruling on the matter is that in order to make one an accomplice, there has to be the requisite intent and that's a material issue of fact that this jury has to decide as to whether Mr. Gutierrez had the requisite intent to be an accomplice, and the jury will make an [sic] determination as to whether or not Mr. Gutierrez is an accomplice. And the court will not be giving the instruction as a matter of law that he is based on the testimony." (*See* 5 RT 1521–22).

Ultimately, the jury was instructed regarding who is liable for a crime and the scope of the liability (CALJIC No. 3.00 and 3.01; 5 RT 1546–47; *see also* 2 CT 336–37); that an aider and abettor is liable for the natural and probable consequences of the crime committed by a principal (*see* CALJIC No.3.02; 5 RT 1547–48; *see also* 2 CT 338); and with the definition of an accomplice (*see* CALJIC No. 3.10 and 3.14; 3 RT 1578, 1580; *see also* 2 CT 371, 374). Further, the jury was instructed with

---

**10.** Cal.Penal Code § 1118.1 provides:

"In a case tried before a jury, the court on motion of the defendant or on its own motion, at the close of the evidence on either side and before the case is submitted to the jury for decision, shall order the entry of a judgment of acquittal of one or more of the offenses charged in the accusatory pleading if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal. If such a motion for judgment of acquittal at the close of the evidence offered by the prosecution is not granted, the defendant may offer evidence without first having reserved that right."

**11.** CALJIC No. 3.15 provides:

"A person who without criminal intent pretends to join in the commission of a crime merely for the purpose of detecting and prosecuting the perpetrator, is not an accomplice and [his][her] testimony need not be corroborated."

**12.** CALJIC No. 3.16 provides:

"If the crime of [ ] was committed by anyone, the witness [ ] was an accomplice as a matter of law and [his][her] testimony is subject to the rule requiring corroboration."

CALJIC No. 2.27, addressing the treatment of the uncorroborated testimony of a single witness (*see* 5 RT 1541; *see also* 2 CT 325); and CALJIC Nos. 3.11,[13] 3.12,[14] 3.18,[15] and 3.19 [16] addressing the treatment of an accomplice's testimony (*see* 5 RT 1578–81; *see also* 2 CT 372–73, 375–76).

### B. *The Court of Appeal decision*[17]

Petitioner argued on direct review that the trial court erroneously refused to instruct the jury that Luis Gutierrez was an accomplice as a matter of law and that his testimony required corroboration, and that the court's failure to properly instruct the jury arbitrarily denied petitioner applica-

tion of the state's own domestic rules in violation of Fourteenth Amendment due process principles. Petitioner asserted, in effect, that under California law, an accomplice is a principal and a principal includes an aider and abettor, and because Gutierrez fell under the definition of an aider and abettor, the jury should have been instructed that he was an accomplice as a matter of law. (*See* Lodgment No. A–1 at 16–34). In rejecting this part of petitioner's claim, the California Court of Appeal reasoned, that, "[t]o be an accomplice as a matter of law, there can be no dispute that the witness was an accomplice, either with

13. The jury was instructed with CALJIC No. 3.11 as follows:
"You cannot find a defendant guilty based upon the testimony of an accomplice unless that testimony is corroborated by other evidence which tends to connect that defendant with the commission of the offense. [¶] Testimony of an accomplice includes any out-of-court statement purportedly made by an accomplice received for the purpose of proving that what the accomplice stated out-of-court was true." (*See* 5 RT 1578–79; *see also* 2 CT 372).

14. The jury was instructed with CALJIC No. 3.12 as follows:
"To corroborate the testimony of an accomplice there must be evidence of some act or fact related to the crime which, if believed, by itself and without any aid, interpretation, or direction from the testimony of the accomplice tends to connect the defendant with the commission of the crime charged; however, it is not necessary that the evidence of corroboration be in itself sufficient to establish every element of the crime charged or that it corroborate every fact to which the accomplice testifies. [¶] In determining whether an accomplice has been corroborated, you must first assume that the testimony of the accomplice has been removed from the case. You must then determine whether there is any remaining evidence which tends to connect the defendant with the commission of the crime. If there is no independent evidence which tends to connect the defendant with the commission of the crime, the testimony of the accomplice is not corroborated. [¶] If

there is independent evidence which you believe then the testimony of the accomplice is corroborated." (*See* 5 RT 1579–80; *see also* 2 CT 373).

15. The jury was instructed with CALJIC No. 3.18 as follows:
"To the extent that an accomplice gives testimony that tends to incriminate a defendant, it should be viewed with caution. This does not mean, however, that you may arbitrarily disregard that testimony. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the evidence in this case." (*See* 5 RT 1580; *see also* 2 CT 375).

16. The jury was instructed with CALJIC No. 3.19 as follows:
"You must determine whether the witness Luis Gutierrez was an accomplice as I have defined that term. [¶] The defendant has the burden of proving by a preponderance of the evidence that Luis Gutierrez was an accomplice in the crimes charged against the defendant." (*See* 5 RT 1580–81; *see also* 2 CT 376).

17. Under *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991), it may be presumed that the California Supreme Court, by its silent denial of petitioner's Petition for Review raising the same claim, did not intend to change the California Court of Appeal's reasoned decision rejecting it.

regard to the facts or the inferences to be drawn from them," and here, Gutierrez's testimony was "riddled with inconsistency" and "gave rise to two diametrically opposed inferences"—one that would "clearly make him an accomplice while the other would not." (*See* Amd. Ans., Exh. C at 47).

Citing *People v. Beeman,* 35 Cal.3d 547, 199 Cal.Rptr. 60, 674 P.2d 1318 (1984), petitioner further argued that an aider and abettor must act "with knowledge of the criminal purpose of the perpetrator *and* with an intent *or* purpose either of committing, or of encouraging or facilitating commission of, the offense," and that therefore, there was no dispute that Gutierrez was an accomplice. Petitioner contended that Gutierrez acted with knowledge of the criminal purpose and admitted being present during the planning. While Gutierrez's intent may have been in dispute, his purpose was not, according to petitioner. Petitioner's argument, then, was premised on the distinction between "intent" and "purpose." In rejecting this argument and petitioner's construction of *Beeman,* the Court of Appeal reasoned as follows:

> "First, the Supreme Court in *Beeman* did not intimate that it intended the words 'intent' and 'purpose' to constitute separate and distinct requirements. Rather, those terms appear to have been used simply as alternative ways of describing a single requirement: that an aider and abettor must harbor a mental state aimed at achieving the charged offense. [¶] Second, Gutierrez's statement that he purchased an AK–47 was contradicted by his statement that he did not. To the extent that [petitioner] contends that the 'purpose' element is undisputed because Gutierrez purchased an AK–47, he is therefore wrong. [¶] Third, [petitioner's] efforts to distinguish between 'intent' and 'purpose' parses that language too finely. The cases he

cites using those terms do not suggest an analytical distinction between them. [Citations omitted]. Webster's Third New World Dictionary defines 'intent' as the 'the design or *purpose* to commit a wrongful act.' (Italics added.) In *Cal–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 173, footnote 5 [83 Cal. Rptr.2d 548, 973 P.2d 527], in discussing the meaning of the word 'purpose' in the Business and Professions Code section 17043, the Supreme Court stated that '[t]he Model Penal Code itself resolves the ambiguity by defining 'intentionally' or 'with intent' as meaning 'purposely.' Thus, intent and purpose can be used as synonyms." (*See* Amd. Ans., Exh. C at 48).

The Court of Appeal proceeded to find that, even if the trial court should have instructed the jury that Gutierrez was an accomplice as a matter of law, the failure to do so was harmless as there was sufficient evidence to corroborate his testimony. (*See* Amd. Ans., Exh. C at 49).

C. *Analysis*

 Here, petitioner contends that he has been denied due process based on the trial court's denial of his state-created right that the jury be instructed that an accomplice's testimony must be viewed with caution and corroborated by sufficient evidence. (*See* Pet. Mem. at 78–84; Trav. at 7–12). Citing *Beeman,* petitioner again contends that under California law, an accomplice is a principal and a principal includes an aider and abettor. The latter, he again asserts, "has long been defined as who acts 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.'" [Citations omitted]. He maintains that the California Supreme Court "intended that 'intent and purpose'

constituted two separate and distinct alternative mental states that would make one an aider and abettor," and that the words 'intent' and 'purpose' are not synonymous. (*See* Pet. Mem. at 79). Therefore, according to petitioner, the California Court of Appeal's construction of the terms "intent" and "purpose" was contrary to long-standing authority and denied him due process.

██ ██ Initially, the Court notes that the requirement under Cal.Penal Code § 1111 that "a conviction cannot be had upon the testimony of an accomplice unless it be corroborated" is a matter of state law, which does not implicate a federal constitutional right. *See Redding v. Minnesota,* 881 F.2d 575, 578 (8th Cir.1989), *cert. denied,* 493 U.S. 1089, 110 S.Ct. 1158, 107 L.Ed.2d 1061 (1990); *Garcia v. Powers,* 973 F.2d 684 (8th Cir.1992). Indeed, the Court notes that no such corroboration requirement exists in a federal criminal prosecution. *See United States v. Necoechea,* 986 F.2d 1273, 1282 (9th Cir.1993); *see also United States v. Lopez,* 803 F.2d 969, 973 (9th Cir.1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face."), *cert. denied,* 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987); *Sabari v. United States,* 333 F.2d 1019, 1020 (9th Cir.1964) ("the uncorroborated testimony of an accomplice, if believed by the jury, is sufficient to support a jury verdict.").

██ Petitioner attempts to circumvent this reality by alleging the claim as a due process violation based on the state's failure to follow its own "domestic rules." However, this claim fairs no better. It is true that a state may not arbitrarily deprive a defendant of a state law entitlement affecting his liberty interest. *See, e.g., Hicks v. Oklahoma,* 447 U.S. 343, 346, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980); *Fetterly v. Paskett,* 997 F.2d 1295, 1300 (9th Cir.1993) ("[T]he failure of a state to

abide by its own statutory commands may implicate a liberty interest protected by the Fourteenth Amendment against arbitrary deprivation by a state."), *cert. denied,* 513 U.S. 914, 115 S.Ct. 290, 130 L.Ed.2d 205 (1994). However, the denial of the application of the State's "domestic rules" that petitioner claims he suffered stems directly from the State courts' allegedly incorrect construction of the terms "intent" and "purpose," in the context of aiders and abettors. Under *Bradshaw v. Richey,* 546 U.S. 74, 76, 126 S.Ct. 602, 163 L.Ed.2d 407 (2005), this Court has no authority to revisit the State courts' construction of its own State laws as it is bound by that construction. *See also Estelle v. McGuire,* 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

Accordingly, the Court has no basis for finding or concluding that the State courts' rejection of this claim either was contrary to or involved an unreasonable application of clearly established Supreme Court law.

## II. *Habeas relief is not warranted with respect to petitioner's instructional error claim directed to CALJIC No. 2.51.*

██ At trial, petitioner's jury was instructed pursuant to CALJIC No. 2.51 as follows:

"Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance in this case. ¶ Presence of motive may tend to establish the defendant is guilty. Absence of motive may tend to show the defendant is not guilty." (*See* 5 RT 1541; *see also* 2 CT 326).

Petitioner contends that this motive instruction vitiated the reasonable doubt standard and thereby reduced the prosecution's burden of proof in violation of his right to due process. (*See* Pet. Mem. at

86–90; Trav. at 13). Specifically, petitioner maintains that CALJIC No. 2.51 "allowed the jury to determine guilt based on the presence of an alleged motive alone and shifted the burden of proof to [petitioner] to show absence of motive to establish innocence, thereby lessening the prosecution's burden of proof." (*See* Pet. Mem. at 87). He asserts that, effectively, the instruction placed the burden on him to "show an alternative motive to that advanced by the prosecutor." (*See id.*). Further, he maintains that "[i]nstructing the jury that the People have introduced evidence tending to prove[ ] [petitioner's] guilt improperly carries the inference that the People have, in fact, established guilt" and that this was the only instruction covering "an individual evidentiary circumstance" that did not include an admonition that that circumstance alone was "insufficient to establish guilt." (*See* Pet. Mem. at 88).

In rejecting this claim on direct review, the California Court of Appeal reasoned, in pertinent part:

> "The People contend that defendants have forfeited this contention by failing to object to, or request clarification or modification, of the instruction in the trial court. We agree. " 'A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " [Citations omitted]. [¶] Even if this contention had been properly preserved for appeal, we would find it to be without merit. It has been explicitly rejected by our Supreme Court in *People v. Snow* [ ] 30 Cal.4th 43, 97–98 [132 Cal.Rptr.2d 271, 65 P.3d 749, *cert. denied,* 540 U.S. 1076, 124 S.Ct. 922, 157 L.Ed.2d 747 (2003) ] where the defendant argued that CALJIC No. 2.51 suggested to the jury that proof of motive alone could establish guilt because it did not caution the

jury that motive alone was insufficient to do so. The Supreme Court stated: 'If the challenged instruction somehow suggested that motive alone *was* sufficient to establish guilt, defendant's point might have merit. But in fact the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of the murder. When CALJIC No. 2.51 is taken together with the instruction on the concurrence of act and specific intent (CALJIC No. 3.31) and the instruction outlining the elements of murder and requiring each of them to be proved in order to prove the crime (CALJIC No. 8.10), there is no reasonable likelihood [citation] it would be read as suggesting that proof of motive alone may establish guilt of murder.' " (*See* Amd. Ans., Exh. C at 41).

## A. *This claim is not procedurally defaulted.*

Respondent contends that this claim is procedurally barred based on petitioner's failure to challenge the instruction in the trial court. (*See* Amd. Ans. at 15–16). The Court disagrees.

In order for a claim to be procedurally defaulted for federal habeas corpus purposes, "the application of the state procedural rule must provide 'an adequate and independent state law basis' on which the state court can deny relief." *Park v. California,* 202 F.3d 1146, 1151 (9th Cir.), *cert. denied,* 531 U.S. 918, 121 S.Ct. 277, 148 L.Ed.2d 202 (2000). "For a state procedural rule to be 'independent,' the state law basis for the decision must not be interwoven with federal law." *La Crosse v. Kernan,* 244 F.3d 702, 704 (9th Cir. 2001); *Morales v. Calderon,* 85 F.3d 1387, 1393 (9th Cir.1996) ("Federal habeas re-

view is not barred if the state decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law.' " "A state law ground is so interwoven if 'the state has made application of the procedural bar depend on an antecedent ruling on federal law [such as] the determination of whether federal constitutional error has been committed.' ") *Park*, 202 F.3d at 1152. In order for a procedural bar to be adequate, state courts must employ a "firmly established and regularly followed state practice." *Ford v. Georgia*, 498 U.S. 411, 423–24, 111 S.Ct. 850, 112 L.Ed.2d 935 (1991).

■ In California, contemporaneous objection to jury instructions is not required if the "substantial rights" of the defendant were implicated by the instructions. *See* Cal.Penal Code § 1259; *People v. Hannon*, 19 Cal.3d 588, 600, 138 Cal. Rptr. 885, 564 P.2d 1203 (1977). Thus, for example, the California Supreme Court has held that the contemporaneous objection rule was not applicable where the defendant was claiming an instruction violated his right to due process. *See People v. Smithey*, 20 Cal.4th 936, 976 n. 7, 86 Cal.Rptr.2d 243, 978 P.2d 1171 (1999), *cert. denied*, 529 U.S. 1026, 120 S.Ct. 1435, 146 L.Ed.2d 324 (2000); *People v. Flood*, 18 Cal.4th 470, 482 n. 7, 76 Cal.Rptr.2d 180, 957 P.2d 869 (1998). The foregoing authorities belie respondent's conclusory assertion that California's contemporaneous objection rule is applied independent of federal law insofar as it relates to instructional errors claims. Since respondent has not even adequately pled the existence of an independent and adequate state procedural ground as an affirmative defense, petitioner is relieved of his burden of placing that defense in issue. *See Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir.), *cert. denied*, 540 U.S. 938, 124 S.Ct. 105, 157 L.Ed.2d 251 (2003). The Court finds and concludes that petitioner's instructional er-

ror claim directed to CALJIC No. 2.51 is not procedurally defaulted.

B. *Analysis*

The Due Process Clause of the Fourteenth Amendment protects the accused in a criminal case against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

■ To merit relief when an allegedly erroneous jury instruction is given, petitioner must show that the "the ailing instruction by itself so infected the entire trial that the resulting conviction violated due process." *McGuire*, 502 U.S. at 72, 112 S.Ct. 475; *Henderson v. Kibbe*, 431 U.S. 145, 154–55, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir.1988). Moreover, the allegedly erroneous instruction must be considered in the context of the instructions as a whole and the entire trial record. *See McGuire*, 502 U.S. at 72, 112 S.Ct. 475; *United States v. Frady*, 456 U.S. 152, 169, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

As noted, in rejecting this claim, the California Court of Appeal adopted the reasoning of the California Supreme Court in *People v. Snow*. In *Snow*, as the Court of Appeal set forth, the California Supreme Court rejected the challenge to CALJIC No. 2.51, reasoning that "the instruction tells the jury that motive is not an element of the crime charged (murder) and need not be shown, which leaves little conceptual room for the idea that motive could establish *all* the elements of the murder" and further, that "taken together with the instruction on the concurrence of act and specific intent [ ] and the instruction outlining the elements of murder and

requiring each of them to be proved in order to prove the crime [ ], there is no reasonable likelihood [citation] it would be read as suggesting that proof of motive alone may establish guilt of murder." *Snow,* 30 Cal.4th at 97–98, 132 Cal.Rptr.2d 271, 65 P.3d 749.

■ Petitioner has not even purported to refute the reasoning of the California Supreme Court in *Snow.* Here, as in that case, the record reflects that the trial court not only instructed the jury on the elements of the crimes charged (*See* 5 RT 1547–48, 1552–53, 1557–67; *see also* 2CT 339, 343, 351, 353–55, 357–60) and the need for the concurrence of act and specific intent (*see* 5 RT 1556; *see also* 3 CT 356), but also instructed the jury on the burden of proof (*see* 5 RT 1545; *see also* 3 CT 309) and to "[c]onsider all the instructions as a whole and each in light of all the others." (*See* 5 RT 1527; *see also* 2 CT 334). The jurors are presumed to have followed the instructions given to them. *See Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987); *Weeks v. Angelone,* 528 U.S. 225, 234, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000); *Francis v. Franklin,* 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985); *Hovey v. Ayers,* 458 F.3d 892, 913 (9th Cir.2006). Here, petitioner has failed to adduce any evidence showing that the jurors failed to follow the instructions they were given— instructions that clearly informed the jurors that in order to find petitioner guilty of the charged offenses, they must find that the prosecution had met its burden of proving each element of the crime(s) beyond a reasonable doubt.

On this record, the Court has no basis for finding that the instruction petitioner now is challenging, when considered in the context of the trial record and the instructions as a whole, "so infected the entire trial that the resulting conviction violated due process." The Court therefore

finds and concludes that the State courts' rejection of this instructional error claim neither was contrary to nor involved an unreasonable application of clearly established Supreme Court law.

### III. *Habeas relief is warranted with respect to petitioner's ineffective assistance of counsel claim.*

■ In *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice."

■ "Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. 2052. To show "deficient performance," petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. 2052. Further, petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* The Court must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Id.* The Supreme Court in *Strickland* recognized that "it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689, 104 S.Ct. 2052. Accordingly, to overturn the strong presumption of adequate assistance, petitioner must demonstrate that "the challenged action cannot reasonably be considered sound trial strategy under the circumstances of the case." *Lord v. Wood,* 184 F.3d 1083, 1085

(9th Cir.1999), *cert. denied,* 528 U.S. 1198, 120 S.Ct. 1262, 146 L.Ed.2d 118 (2000).

■ To meet his burden of showing the distinctive kind of "prejudice" required by *Strickland,* petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. *See also Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993) (noting that the "prejudice" component "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair").

It is unnecessary to address both *Strickland* requirements if the petitioner makes an insufficient showing on one. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."); *see also Rios v. Rocha,* 299 F.3d 796, 805 (9th Cir.2002) ("Failure to satisfy either prong of the *Strickland* test obviates the need to consider the other."); *Williams v. Calderon,* 52 F.3d 1465, 1470 n. 3 (9th Cir.1995), *cert. denied,* 516 U.S. 1124, 116 S.Ct. 937, 133 L.Ed.2d 863 (1996).

### A. *Petitioner's claim*

Petitioner contends in the Petition that his trial counsel rendered ineffective assistance at trial in the following respects: (1) failing to investigate and introduce Luis Gutierrez's numerous crimes of moral turpitude, readiness to violently retaliate, and motive to falsely implicate petitioner; (2) failing to introduce the testimony of peti-

tioner's closest friends, work associates, mother, wife, daughter Inisha, son Nathan, and ex-boyfriend of daughter Vanessa that petitioner had done nothing that indicated in any way that he had conspired in the crimes charged and that the only person who had suggested retaliation was Luis Gutierrez; (3) missing two opportunities to directly impeach Luis Gutierrez's trial testimony by introducing evidence that Gutierrez did have guns; (4) failing to introduce testimony of defense character witnesses that were either present in court or readily available to attest to petitioner's character for non-violence; (5) failing to investigate and introduce news articles at the time of the shooting to refute the claim that Luis Gutierrez had no way of knowing how the shooting had taken place; (6) failing to introduce evidence that Alex Guerrero's background and prominent tattoo manifested his readiness for retaliation without third party inducement; and (7) failing to challenge the prosecution's peremptory challenges to prospective Hispanic jurors and yet leaving on the panel a juror with a family member, friends, and neighbor in law enforcement.[18] Petitioner further maintains that he was prejudiced by trial counsel's errors, and that the State appellate court's decision involved an unreasonable application of the facts and of State and Federal authority. (*See* Pet. Mem. at 25–78).

### B. *The standard of review for this claim*

As to the *Strickland* prejudice prong, respondent has conceded that the standard of review is *de novo* since the state courts did not reach the issue. *See Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456,

---

**18.** Petitioner's counsel subsequently waived subclaim (7) in petitioner's Supplemental Statement Detailing by Claim the Contemplat-

ed Witnesses and Evidence to be Proffered at the Evidentiary Hearing, filed on July 4, 2008.

162 L.Ed.2d 360 (2005); (*see* Amd. Ans., Exh. E).

As to the deficient performance prong, the Supreme Court has not decided whether the AEDPA standard of review applies where, as here, the district court has concluded that further development of the record is not precluded by 28 U.S.C. § 2254(e),[19] as evidenced by the Supreme Court's grant of certiorari in *Bell v. Kelly*, 553 U.S. 1031, 128 S.Ct. 2108, 171 L.Ed.2d 228 (2008) (granting certiorari to decide issue of whether Circuit Court erred in applying § 2254(d) to claim predicated on evidence of prejudice the state court refused to consider and that was properly received for the first time in a federal evidentiary hearing), *cert. dismissed as improvidently granted at* — U.S. —, 129 S.Ct. 393, 172 L.Ed.2d 353 (2008), and its recent decision in *Knowles v. Mirzayance*, — U.S. —, 129 S.Ct. 1411, 1419 n. 2, 173 L.Ed.2d 251 (2009) (where petitioner did not "argue[ ] that § 2254(d) is entirely inapplicable to his [ineffective assistance] claim or that the state court failed to reach an adjudication on the merits, we initially evaluate his claim through the deferential lens of § 2254(d)"). However, under Ninth Circuit jurisprudence, the AEDPA standard of review does not apply where, as here, the state courts refused to grant the petitioner an evidentiary hearing to fully develop the facts supporting his claim and evidence relevant to the determination of the claim is developed during the course of the federal habeas proceeding. *See Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir.2002) (holding that the AEDPA standard of review did not apply to a knowing use of perjured testimony claim where evi-

dence of the perjury was adduced only at the hearing before the magistrate judge), *cert. denied*, 537 U.S. 1179, 123 S.Ct. 992, 154 L.Ed.2d 927 (2003); *see also Miller v. Terhune*, 510 F.Supp.2d 486, 492–93 (E.D.Cal.2007) (citing *Killian*, finding AEDPA inapplicable on petitioner's IAC claim where evidence upon which adjudication must be based was adduced for the first time at a federal evidentiary hearing); *Torres v. Lytle*, 461 F.3d 1303, 1312 (10th Cir.2006) ("We have held that after a federal-court evidentiary hearing, we no longer defer to the state court's decision."); *Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir.2003) ("AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on Brady material that has surfaced for the first time during federal proceedings."); *but see Matheney v. Anderson*, 377 F.3d 740, 747 (7th Cir.2004) ("[O]ur case law is clear in holding that § 2254(d) is applicable even though the district court held an evidentiary hearing. The evidence obtained in such a hearing is quite likely to bear on the reasonableness of the state courts' adjudication but we do not see why it should alter the standard of federal review." (internal quotation marks, citations, and ellipsis omitted)), *cert. denied*, 544 U.S. 1035, 125 S.Ct. 2252, 161 L.Ed.2d 1063 (2005).

C. *Evidence excluded from the evidentiary hearing in this Court*

Prior to the evidentiary hearing, the parties submitted statements detailing the evidence that they proposed to present in support (or defense) of each ineffective assistance subclaim. After duly consider-

---

**19.** The Court is mindful that much of the evidence presented at the evidentiary hearing was encompassed by the declarations submitted to the California courts in support of petitioner's habeas filings. However, by not affording petitioner an evidentiary hearing, the California courts did not have the benefit of assessing the demeanor of petitioner's witnesses, for purposes of determining whether they would have made good witnesses. The California courts also did not have the benefit of trial counsel's, the trial prosecutor's, or the *Strickland* expert's testimony.

ing their respective positions, the Court issued a ruling detailing what evidence the parties would be allowed to present at the evidentiary hearing. As to petitioner's proposed evidence, the Court ruled: (1) evidence on the issue of Guerrero's tattoos, gang ties, and readiness to retaliate would be excluded, since under Cal. Evid.Code § 1101(a), the evidence would not have been admissible at trial to show character to prove conduct; (2) evidence on the issue of Gutierrez's drug dealing would be limited to Michael Gabriel's witnessing of petitioner's Gutierrez's offer to sell Gabriel's friend cocaine at a party; other evidence of Gutierrez's alleged drug dealing would be excluded as irrelevant and inadmissible hearsay; (3) evidence of Gutierrez having set his ex-girlfriend Laura Frausto's car on fire after their break-up would be excluded since it was not supported by a proper foundation and would likely have been excluded at trial under Cal. Evid. Code § 352; (4) evidence of Gutierrez's alleged murder of his cousin's attacker and his participation in a shooting at a park would be excluded since such evidence would likely have been excluded at trial under Cal. Evid.Code § 352; (5) Inisha's proposed testimony regarding incident involving a cable salesman and Michael Gabriel's witnessing of petitioner hiding guns during that incident would be excluded since the conduct did not involve moral turpitude; (6) evidence regarding Gutierrez's purchase of an automatic rifle from Ray Valentine would be excluded since such evidence would likely have been excluded at trial as collateral impeachment; and (7) newspaper articles to refute Gutierrez's claim that he had no way of knowing how the shooting took place would be excluded since petitioner had failed to convince the Court that such evidence would have been admissible at trial on cross-examination of Gutierrez or during the presentation of the defense case.[20] (See Court's December 11, 2008 Tentative Ruling and January 22, 2009 Minute Order).

At the September 25, 2008 status conference, petitioner conceded that if the Court found that the evidence that petitioner had proffered would not even have been admissible under California Evidence law, the failure of trial counsel to investigate and present that evidence could not constitute ineffective assistance of counsel under either the deficient performance prong or the prejudice prong. Accordingly, as to the evidence excluded from the evidentiary hearing because of its likely inadmissibility at trial as set forth above, the Court finds and concludes that trial counsel was not ineffective in failing to investigate and present such evidence, and that petitioner was not prejudiced by counsel's failure to investigate and (attempt to) present such evidence. See, e.g., James v. Borg, 24 F.3d 20, 27 (9th Cir.) (failure to take a futile action does not constitute ineffective assistance of counsel), cert. denied, 513 U.S. 935, 115 S.Ct. 333, 130 L.Ed.2d 291 (1994); Morrison v. Estelle, 981 F.2d 425, 429 (9th Cir.1992), cert. denied, 508 U.S. 920, 113 S.Ct. 2367, 124 L.Ed.2d 273 (1993). This finding and conclusion is dispositive of subclaims (3), (5), and (6).

### D. Evidentiary hearing testimony

A summary of the testimony presented at the evidentiary hearing, along with the Court's credibility findings relating to each witness, is set forth in Appendix A hereto.

### E. Analysis

#### 1. Deficient Performance

 The duty to investigate is not limitless and does not require that every

---

**20.** The Court also ruled inadmissible the proposed written testimony of the trial judge regarding the extent to which character evidence and collateral impeachment evidence would have been admissible and admitted at trial, offered by respondent.

conceivable witness be interviewed. *See Riley v. Payne,* 352 F.3d 1313, 1318 (9th Cir.2003); *Hendricks v. Calderon,* 70 F.3d 1032, 1040 (9th Cir.1995); *United States v. Tucker,* 716 F.2d 576, 584 (9th Cir.1983). However, defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691, 104 S.Ct. 2052; *see also Sanders v. Ratelle,* 21 F.3d 1446, 1456 (9th Cir.1994) ("[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client."). Where an attorney has consciously decided not to conduct further investigation because of reasonable tactical evaluations, his or her performance is not constitutionally deficient, *see Siripongs v. Calderon,* 133 F.3d 732, 734 (9th Cir.1998); *Babbitt v. Calderon,* 151 F.3d 1170, 1173 (9th Cir.1998); *Hensley v. Crist,* 67 F.3d 181, 185 (9th Cir.1995), but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation," *Reynoso v. Giurbino,* 462 F.3d 1099, 1114 (9th Cir.2006) (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052). "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Cox v. Del Papa,* 542 F.3d 669, 679 (9th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1403, 173 L.Ed.2d 610 (2009). "A lawyer who fails adequately to investigate, and to introduce into evidence [information] that demonstrate[s] his client's factual innocence, or that raise[s] sufficient doubt as to that question to undermine confidence in the verdict, renders deficient performance." *Hart v. Gomez,* 174 F.3d 1067, 1070 (9th Cir.1999) (as amended); *Reynoso,* 462 F.3d at 1112 (same); *Avila v. Galaza,* 297 F.3d 911, 919 (9th Cir.2002) (same), *cert.*

*dismissed,* 538 U.S. 919, 123 S.Ct. 1571, 155 L.Ed.2d 308 (2003); *see also, e.g., Richter v. Hickman,* 578 F.3d 944, 952–53 (9th Cir.2009) (finding counsel ineffective when he failed to conduct investigation into forensic evidence that would have contradicted the prosecution's explanation of the events and would have strongly supported the defense's version).

■ Here, Mr. Robusto acknowledged that it would have been helpful to the defense case to present evidence of Gutierrez's bad character. Mr. Robusto testified that his theory of the case was that Gutierrez was involved in the murder and was trying to divert the blame—therefore, he testified, any acts of violence with which he could have confronted Gutierrez would have been consistent with this defense. However, Mr. Robusto did not hire an investigator to delve into Gutierrez's background, despite the family's expressed willingness to provide financial resources for an investigator. Specifically, Mr. Robusto testified that he initially attempted to retain an investigator—Lawrence DeLosh—but when DeLosh was unavailable, Mr. Robusto failed to retain another investigator. He purported to justify his ultimate failure to hire an investigator on the lack of any leads for the investigator to follow. The Court finds, however, based on the evidence presented at the evidentiary hearing, that a competent investigator would have ferreted out that there was evidence of Gutierrez's bad character that could and should have been presented at trial. This is borne out by the evidence developed post-trial by habeas counsel. A competent pretrial defense investigation would have revealed that Inisha Barco could present percipient testimony about the Faststrip gas station incident, when Gutierrez had exhibited a propensity for violence and retaliatory conduct by running down an enemy gang member who

had been taunting him minutes before.[21] Consistent with the other bad character evidence, Mr. Robusto also could have presented evidence through Inisha Barco that she and Gutierrez had a fight after she inquired of him whether he was selling drugs and she asked him to leave. Gutierrez told Inisha he would kill her and the person she was with if she dated anyone else. After Gutierrez moved out of the apartment the next day, and petitioner changed the locks at Inisha's request, Gutierrez broke into the apartment and removed approximately $500–600 in electronics that he had purchased for Inisha's daughter and $1,000 in cash belonging to Inisha. Gutierrez threatened that if Inisha pressed charges, he would go to police with information about petitioner and Alex. A competent pretrial investigation also would have led to Frausto, who could have testified that she dated Gutierrez from 1999 to 2003 and that they had an on-again, off-again relationship; that she found Gutierrez controlling and jealous; and that when they broke up, Gutierrez broke into her home and took things that he had given to her. A competent pretrial defense investigation also would have led to Michael Gabriel, who could have testified, as he did at the evidentiary hearing, that in September 2004, he threw a party in his dorm for his roommate while he was attending California State University at Los Angeles, which Gutierrez attended; and that Gabriel saw Gutierrez with a bag of marijuana at the party, which he asked if anybody wanted to buy. In the Court's view, Mr. Robusto's failure to investigate Gutierrez and then present the evidence of Gutierrez's bad character that a competent investigation would have ferreted out falls below prevailing professional norms.

In addition, at his deposition, Mr. Robusto acknowledged that the best way to prove that petitioner had not conspired with Gutierrez would be to produce witnesses to the supposed conversations about retaliation who would deny that those conversations took place. At the deposition, without having the benefit of reviewing the trial testimony, Mr. Robusto testified that the reason he had not presented such counter evidence was because the conversations had taken place in private. In fact, the transcript of the trial testimony reflects that Gutierrez repeatedly testified that the conversations about retaliation took place in the presence of the family members on almost a daily basis, both while Johnny was hospitalized and around the family dinner table; and that the conversations about retaliation were between the family members and not conversations between petitioner and Gutierrez. (*See* 3 RT 737, 748). On cross-examination of Vanessa Barco at trial, Mr. Robusto did elicit from her that at no time during her daily visits at the hospital, at which petitioner, Marivel, Inisha, Gutierrez, and Alex were present, did she hear petitioner indicate that he was going to get back at the people that "did this." (*See* 3 RT 1256–57). However, Mr. Robusto could also have presented evidence from other family members who, according to Gutierrez, also were present at the conversations about retaliation. Nathan Barco would have testified that he never heard talk of retaliation from his dad. Inisha and Marivel Barco would likewise have testified. The Court is mindful that Marivel invoked the marital privilege not to testify against her husband, but the Court cannot help but wonder whether her deci-

---

21. The Court does not attach much weight to the issue of whether Inisha correctly remembered giving Robusto a list of Gutierrez's "bad acts," or the issue of *when* Delmar and Rodriguez were discovered and whether Robusto was told about them (by name). In the Court's view, a competent investigator would have been able to elicit the necessary information to discover this evidence for himself.

sion to do so, presumably based on Mr. Robusto's advice, was a fully informed one that weighed the consequences (namely that she would not be able to provide any testimony helpful to her husband's defense).[22] Moreover, as noted above, if Mr. Robusto had done a competent investigation, it would have led to Gabriel, who could have testified that he also was present at the hospital at the same time as Gutierrez and never heard any talk by petitioner about retaliating. In fact, Gabriel would have testified that the only talk of retaliation came from Gutierrez himself, who angrily told Gabriel that he and his cousins would "take care of it." In the Court's view, the failure to present any of this evidence falls below prevailing professional norms.

Nor is the Court's view regarding Mr. Robusto's failure to present evidence of Gutierrez's bad character and failure to present evidence that the conversations about retaliation had not taken place altered by possible lines of impeachment that the prosecutor could have employed if such evidence had been presented.[23] Obviously, Nathan, Inisha, and Marivel were biased in favor of petitioner. However, the Ninth Circuit has found that witness testimony should not be discounted simply because the witnesses have familial ties to the defendant. *See Luna v. Cambra,* 306 F.3d 954, 962 (9th Cir.2002). The failure to investigate and present the testimony of family members and loved ones has been found to constitute ineffective assistance of counsel where their testimony would have corroborated the defense. *See id.* ("that Jennie and Gloria Luna were family members did not render trial counsel's failure to investigate and present their corroboration of Luna's alibi harmless" where defendant's "bare testimony" was the only proof that he was asleep at time of crime); *Brown v. Myers,* 137 F.3d 1154, 1157–58 (9th Cir.1998) (likelihood of jury crediting petitioner's defense when corroborated by alibi witnesses not called at trial, including petitioner's sister, was sufficiently probable to undermine confidence in outcome of trial). Here, Inisha and Gabriel's testimony regarding Gutierrez's acts of moral turpitude, and Inisha, Nathan, and Marivel's testimony regarding the lack of conversations regarding retaliation, not only was consistent with petitioner's defense that Gutierrez had falsely implicated him, but was critical to it.

At the evidentiary hearing, Mr. Robusto testified that the failure to present any character witnesses on behalf of petitioner was a deliberate one, made in consultation with, and the ultimate concurrence of, petitioner and his wife. But Mr. Robusto did concede that the decision whether or not to call the character witnesses ultimately was his to make, not petitioner's. Mr. Robusto made that decision without even interviewing any of the character witnesses himself, to assess their demeanor and how they would have held up on cross-examination.[24] His rationale in not presenting any of the available character witnesses was that the character witness testimony would be "flat" and "shallow" in the absence of petitioner's own testimony (since petitioner had elected not to testify), and that the focus of the trial would shift from Gutier-

---

**22.** This is especially so given Mr. Robusto's own opinion was that Marivel would have been a good witness because she was "solid," "clear," and had a "distinct recollection of events." (*See* 5–29–09 EHT at 180).

**23.** The Court has reviewed the police interviews conducted with Inisha and Marivel as well as the audio and videotapes of those interviews. The statements made therein reveal no glaring inconsistencies and no statements that the Court views as inculpatory of petitioner.

**24.** Mr. Robusto testified that Marivel Barco told him what the witnesses would testify to.

rez back to what petitioner allegedly had done. However, the Court concurs with petitioner's *Strickland* expert that it was objectively unreasonable for Mr. Robusto to make the decision not to call the character witnesses without interviewing them.[25] *See, e.g., Riley,* 352 F.3d at 1319 ("the rule of *Strickland* requiring 'reasonable professional judgments' before limiting investigation is offended" where counsel did not interview potential defense witness to determine what he would say, whether he would be a credible defense witness, and whether he should have been called to testify). Put another way, Mr. Robusto's decision not to call the character witnesses cannot be deemed a fully informed one. For example, if Mr. Robusto had interviewed Ray Padilla, he not only would have seen that Padilla had a very credible demeanor, but he also would have found out that Padilla's opinion about petitioner's character would not have been changed by the supposed threats by petitioner on the tape of the pretextual calls (which Padilla did not even regard as threats of violence).[26] Padilla also could have been used to rebut Gutierrez's testimony concerning petitioner's supposed connections to the Mexican Mafia. Although Mr. Robusto had attempted to demonstrate the implausibility of such a connection during his cross-examination of Gutierrez (*see* 4 RT 939–40), the point Mr. Robusto had tried to make could have been made much more effectively through direct examination of

Padilla, a 30–year veteran of the prison system. While the Court is not prepared to find that the failure to call the other character witnesses was objectively unreasonable, given the Court's assessment of the quality of their testimony and the likely cross-examination, the Court finds that the failure to call Padilla as a character witness was not an objectively reasonable, fully informed tactical decision.[27] *Cf. Matylinsky v. Budge,* 577 F.3d 1083, 1096–97 (9th Cir.2009) (rejecting IAC claim based on failure to call good character witnesses where petitioner failed to show what the nature of the testimony of the additional 41 good character witnesses would have been, and where counsel did present a few select character witnesses).

To the extent that petitioner adduced evidence at the evidentiary hearing that Gutierrez was motivated to implicate petitioner because Inisha would not return his tools or other property or because of the vandalism to his car, the Court finds that the failure to present evidence supportive of this theory was not objectively unreasonable. In the first place, the threats to implicate petitioner if the tools and property were not returned were made during the pretext phone calls, as part of the police-orchestrated effort to get petitioner to incriminate himself and/or family members to incriminate petitioner. Second, putting aside that Mr. Robusto testified he was unaware of the vandalism incident (a

---

**25.** In fact, notwithstanding Mr. Robusto's testimony, the Court is dubious that he ever intended to call any character witnesses or in fact gave the issue the consideration due in light of the fact that he never noticed the witnesses to the prosecution. It is entirely unclear to the Court why Mr. Robusto, if he had indeed been considering presenting the character witnesses, would have risked discovery sanctions by not timely noticing them to the prosecution.

**26.** Based on the testimony of the prosecutor, it is not even clear that the prosecutor would have played those tapes to Padilla. In the *Strickland* expert's view, either way it was a "win win" for petitioner and the Court concurs.

**27.** As the *Strickland* expert also opined, had counsel called character witnesses, petitioner would have been given the benefit of a jury instruction advising that good character alone may be sufficient to raise a reasonable doubt. (*See* CALJIC No. 2.40).

point contradicted by his own notes), he could reasonably have concluded that the jury would not find it plausible that Gutierrez would go to the extreme of framing petitioner for murder simply because a couple of windows had been broken in Gutierrez's car.

Nevertheless, for the other reasons discussed above, the Court finds and concludes that petitioner has met his burden with respect to the *Strickland* deficient performance prong.

### 2. *Prejudice*

 The question thus becomes whether the Court is prepared to find and conclude that, but for the failure to present the evidence adduced at the evidentiary hearing of Gutierrez's bad character, including his past retaliatory conduct, the evidence directly contradicting Gutierrez's testimony regarding the conversations about retaliation, and evidence of petitioner's good character (and in particular Mr. Padilla's testimony), there is a reasonable probability that the outcome of the trial would have been different. The Court so finds and concludes. The evidence against petitioner at trial was weak, and without the testimony discussed above, the jury was left without a complete picture of the facts at hand. Gutierrez was the critical witness for the prosecution, as acknowledged by the prosecutor; in this Court's view, without Gutierrez's testimony, the prosecution would have been unable to proceed. Yet the jury heard no evidence of Gutierrez's own retaliatory and violent exploits and bad character, and no evidence from the multiple family members who could have disputed Gutierrez's claim that petitioner's talk of retaliation took place virtually every day in the presence of those very family members. Further, the jury was left without evidence of petitioner's own character for non-violence. This is sufficient to undermine the Court's confidence in the outcome of the trial. Ac-

cordingly, the Court recommends that habeas relief be granted with respect to petitioner's ineffective assistance of counsel claim.

### RECOMMENDATION

IT THEREFORE IS RECOMMENDED that the District Court issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing that Judgment be entered granting a conditional writ of habeas corpus as follows: Unless petitioner is brought to retrial within sixty (60) days of the date the Judgment herein becomes final (plus any additional delay authorized under State law), respondent shall discharge petitioner from all adverse consequences of his conviction in Los Angeles County Superior Court Case No. KA069089.

### APPENDIX A

### *Evidentiary Hearing Testimony*

#### 1. *Petitioner's witnesses*

#### *Michael Gabriel*

##### *Direct Examination*

Gabriel lives in Ohio and came to testify at the evidentiary hearing at his own expense. (*See* Transcript of May 28, 2009 Evidentiary Hearing ["5–28–09 EHT"] at 13–14). He met Vanessa and Inisha in 2002 and dated Vanessa. He was also acquainted with Luis Gutierrez and has met petitioner. Gabriel moved into Vanessa's apartment, where Inisha lived too, for about three months. Gutierrez was dating Inisha. (*See* 5–28–09 EHT at 14–15). Gabriel became friends with Gutierrez. (*See* 5–28–09 EHT at 15). In September 2004, Gabriel was attending Cal. State L.A. and threw a party for his roommate. Gutierrez and his cousins attended. Gabriel saw Gutierrez ask anybody if they would like what looked like a bag of marijuana. Ga-

▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

briel had seen marijuana before. (*See* 5–28–09 EHT at 18, 22–24).

Gabriel remembers being in the hospital when Johnny was there, and he saw Gutierrez at the hospital. Gutierrez was angry and upset and told Gabriel he would take care of the situation as far as retaliation. Gabriel did not respond. (*See* 5–28–09 EHT at 24–25). At the hospital, Gabriel saw petitioner on the phone trying to get hold of press and talking to police. Petitioner never talked about retaliation. The only time Gabriel ever heard of retaliation was from Gutierrez. Gutierrez did not say how he would retaliate, he just said that he and his cousins would "take care of it." Gutierrez was Gabriel's ride to the hospital, and Gabriel went about three times. Gutierrez talked of retaliation only one time. (*See* 5–28–09 EHT at 25–26).

Gabriel was never interviewed by Robusto. The only person Gabriel has spoken to is the person with whom he made the declaration. (*See* 5–28–09 EHT at 27).

*Cross–Examination*

Gabriel's $400 plane ticket was covered to get here, but he paid for the hotel, meals, and to take off work. (*See* 5–28–09 EHT at 27–28).

Gabriel does not have a child with Vanessa. He did not become close to petitioner or Johnny. He was at the hospital to support the family because of the situation and their time of need. He felt close to the family at that point. (*See* 5–28–09 EHT at 28–29). Gabriel met Vanessa at a nightclub. They had a long distance relationship for 6 or 7 months since he was in Ohio; he traveled back and forth to California. He then moved to California and moved in with Vanessa immediately. The total length of their relationship was 3 or 4 years. Vanessa did not have a child at that time. (*See* 5–28–09 EHT at 29). They broke up because Gutierrez men-

tioned to Vanessa that he (Gabriel) was talking to other women during the relationship; he said in his declaration that he separated from Vanessa because Gutierrez told her he was being unfaithful. He was a little upset about that; he felt that Gutierrez was the cause of the break-up. Prior to that time, they had had some rough times, but the relationship was okay. (*See* 5–28–09 EHT at 29–30).

Gabriel has never been arrested. He knows a lot of people who use marijuana; that is how he is familiar with it. He does not do it. (*See* 5–28–09 EHT at 30). Gabriel was not personally aware of any other conversation about retaliation for Johnny's beating other than the one he mentioned with Gutierrez. During the time Johnny was in the hospital, Gabriel did not spend much time with petitioner. Petitioner seemed busy with a lot of things. He was on the phone a lot, and mentioned he was calling newspapers and trying to talk to police. Gabriel never personally saw him talk to police. Gabriel thinks he was upset about Johnny's condition but does not know if he was more upset that it was an unsolved crime. He does not know if petitioner was successful in getting the attention of the press or police. (*See* 5–28–09 EHT at 31–32).

*Re-direct Examination*

Gabriel felt that Gutierrez had been the cause of his breakup with Vanessa in 2004/2005. Gabriel is now married and has children, and he was married when he was contacted by an investigator in this case. Gabriel does not at all harbor ill will toward Gutierrez for that incident. He has only been contacted by one investigator, after the shooting. He was a student at the time. Now he has an on-line business. (*See* 5–28–09 EHT at 32–35).

*Re-cross Examination*

Gabriel did not attend the trial. He is not sure how long after the trial he was

contacted by investigator but he was living in California. Someone else prepared the declaration. He read it and signed it. (*See* 5–28–09 EHT at 35–37). He was told they were trying to get information they did not have from before. They did not say why. He could not recall whether he knew petitioner had been convicted of murder; he knew he was in jail. He figured because he knew Gutierrez and was involved in the whole situation, that was why he was being asked to sign a declaration. The investigator told Gabriel what Gutierrez had said, and Gabriel knew some of it was false so he came to the conclusion Gutierrez had given false testimony. (*See* 5–28–09 EHT at 37–38).

### *The Court's Credibility Finding*

The Court finds Gabriel's testimony creditworthy. There was nothing about his demeanor or the testimony itself that would cause a reasonable trier of fact to believe that he was testifying falsely, and in fact, the Court found Gabriel to be quite credible. The discrepancy between his declaration that he saw Gutierrez attempt to sell cocaine at the party and his testimony that it was marijuana did not detract from his overall credibility. Nor did his initial statement that he traveled to California at his own expense detract from his overall credibility—he explained that he felt he had come at his own expense since he had to pay for his hotel and meals and take off work to come, though his plane ticket was covered.

### **Laura Frausto**

#### *Direct Examination*

Frausto, a hairstylist, lives in Riverside and dated Gutierrez from 1999–2003. Gutierrez was very controlling, jealous, and angry—he did not like her to talk to other guys and wanted to know where she was every minute. (*See* 5–28–09 EHT at 39–41, 46). At the end of the relationship, somebody broke into her apartment, where she lived by herself, and Gutierrez admitted it. He took items that he had given her in the years they were together. She cannot recall what they were at this time but he had given them to her. (*See* 5–28–09 EHT at 41–42, 44). Gutierrez said they were things that he had given her and since they were not together anymore, he was going to take them back. He did not give the items back. She did not call police; she did not care about the items and was scared of him. He never threatened her but he did say he would kill himself if she did not stay with him. (*See* 5–28–09 EHT at 45).

#### *Cross Examination*

She and Gutierrez were together 4 years. She did not care to call police after the break-in; she just went back to her parents' house. It was his aunt's house where she was living. She cannot remember what he took-it could have been movies, little things. (*See* 5–28–09 EHT at 47–48). The break-in occurred around 2000. They got back together after this break-in for maybe a few months. (*See* 5–28–09 EHT at 48–49). Frausto did not mention in the declaration for this case what items were taken; she did not know then. Frausto stayed with Gutierrez because she loved him. She does not still love him. He was aggressive and violent, though he was never violent toward her. If he argued with her, she could give it as well as she could take it. (*See* 5–28–09 EHT at 49–50).

#### *Re-direct Examination*

Frausto was never approached by Robusto and never spoke to an investigator from Robusto's office. She did not write the declaration she signed but she was interviewed beforehand, the declaration was shown to her, and it contained everything she told the person who prepared it. (*See* 5–28–09 EHT at 50–52).

### Re-cross Examination

Her declaration did not say that Gutierrez had admitted to her that he had broken into the apartment; she did not think and could not remember whether she was asked how she knew who had broken into her house. (*See* 5–28–09 EHT at 52–53).

### Re-re-direct Examination

She does not remember if they asked her how she knew who had broken into the apartment, but Gutierrez's admission is the reason she knew that he did it. (*See* 5–28–09 EHT at 53–54).

### The Court's Credibility Finding

The Court finds Frausto's testimony creditworthy. There was nothing about her demeanor or the testimony itself that would cause a reasonable trier of fact to believe that she was testifying falsely.

## Christina Martinez

### Direct Examination

When shown her declaration (Petitioner's Exhibit 11), Martinez testified she remembered that "letter," including signing it. (*See* 5–28–09 EHT at 65–67).

She is acquainted with petitioner. She was present in court one time when the trial was going on. She was told she was a possible witness who could be called. She never talked to the attorney. (*See* 5–28–09 EHT at 67–68). Martinez has been employed for 25 years as an elementary school nurse. During that time, she got to know petitioner from West Covina High School where he worked. Her son was in an after-school program and petitioner was the teacher. She worked in another district. (*See* 5–28–09 EHT at 68–69). She has known petitioner for about 11 years going back from today. In that period of time, she got to know what kind of a person he was in terms of character, and she observed him. Petitioner has a reputation for nonviolence. She is personally acquainted with that information about him. He was an excellent teacher, a role model, a nonviolent and caring individual, and he had a lot of patience. The charges she heard (alleged against him) were out of character for him. (*See* 5–28–09 EHT at 69–71).

### Cross–Examination

Martinez considers herself a family friend of petitioner's. She got to know him in the high school as a good, "awesome" teacher and before her son graduated in 2001, they had a gathering to which she invited him and his family. Petitioner and his wife and his sister-in-law—his wife's sister—came to her home. Petitioner was her son's special education teacher for maybe a year. (*See* 5–28–09 EHT at 72–73). When she would go to the school to pick her son up, she would sit down in the classroom and watch petitioner teach. She had no other contacts with petitioner outside of school and that one gathering at her home. Her statement that he is a family friend is based on that gathering and school contact. (*See* 5–28–09 EHT at 73–74). She did not believe it when he was arrested. When she was in the courtroom during his trial, she watched the testimony of three witnesses. She recalls them—his second daughter, an Asian—a female neighbor—and a young kid. They were D.A. witnesses. With respect to the "young kid," Martinez perceived that "something wasn't right." His first name was Luis. (*See* 5–28–09 EHT at 74–76).

She was watching the trial because she was told she might be a witness. She cannot remember who told her she might be called. She came by herself. (*See* 5–28–09 EHT at 76–77). The witness she saw was accusing petitioner of wrongdoing. She did not believe him. It made her want to testify more for petitioner. (*See* 5–28–09 EHT at 77–79).

During her encounters with petitioner, she never saw him angry. She has seen a teacher angry in a school setting, but not with special education students. At the gathering at her house, she did not see him angry. It was a festive occasion. She had never seen petitioner in a situation where anger might be expected. She does not know how he would behave in those situations. She saw him in the classroom. Those kids would act up and he was very patient and knew how to be calm; she saw him take care of it calmly and they obeyed him. She believed he would be calm in every conceivable situation because he was a patient, compassionate person. (*See* 5–28–09 EHT at 79–81).

### Re-cross Examination

She was subpoenaed to come to this hearing. She did not get a subpoena to go to trial. She was told after she went into the courtroom that she might be a witness. (*See* 5–28–09 EHT at 81–82).

### The Court's Credibility Finding

The Court finds Martinez's testimony creditworthy. There was nothing about her demeanor or the testimony itself that would cause a reasonable trier of fact to believe that she was testifying falsely. However, the Court also finds that the testimony, while sincere, was not particularly probative since Martinez's interaction with petitioner was limited to contacts at school and one gathering at her home for a festive occasion. Accordingly, her own opinion that he was a non-violent person was based on a limited relationship with him. Further, the basis for her knowledge about his reputation for non-violence is unclear.

### Jean Marie Scroggins

#### Direct Examination

Scroggins lives in Colton and has known petitioner for about 6–7 years. She is a special education teacher for the Fontana Unified School District and works for the California Department of Corrections and Rehabilitation ("CDCR" or "CDC") in Chino—specifically, the California Youth Authority ("CYA" or "YA"). During her time with CYA, she worked with petitioner for three or four years and saw petitioner all the time because they shared an office. (*See* 5–28–09 EHT at 85–86). Each CYA employee undergoes a background investigation. They check into prison gang affiliations, including the Mexican Mafia, and they do an FBI check. They also do background checks for the public school system. (*See* 5–28–09 EHT at 87–89).

Scroggins is familiar with petitioner's character. She knows of his reputation from sharing an office with him, and they went to school together at San Diego State. His character was that of a God-loving, family-loving man. She got to spend quality time with him. She would characterize him as non-violent. She observed him with students, and they were crazy about him. He was "forever" trying to help them better themselves. They were devastated when they found out he was no longer there. (*See* 5–28–09 EHT at 89–90).

"Robusto" is not a familiar name to her, and she was not contacted by any investigator for him. The only investigator who contacted her was petitioner's current counsel's investigator. (*See* 5–28–09 EHT at 90–91).

#### Cross-Examination

Scroggins knew petitioner as a family and loving man because they worked together and they talked. They would watch the Lakers game at work together. He talked about his family. She knew his family before she ever saw any of them. He talked about his son Johnny but no more than he talked about the rest of them. (*See* 5–28–09 EHT at 91–92). Scroggins reviewed her declaration, and it

refreshed her recollection that he was upset after Johnny's assault. Petitioner was hurt by the incident. (*See* 5–28–09 EHT at 92–93). He did not call the police while he was at work or try to find the people responsible, that she knew of. What he said to her was that his son had gotten hurt and he promised God that if his son was okay, he would serve him for the rest of his life. He did not say anything about wanting to find the people who did it. (*See* 5–28–09 EHT at 93–94).

This was the first time she was asked to come to court for petitioner; she would have come if asked. (*See* 5–28–09 EHT at 94–95). Scroggins does not have that much knowledge of the Mexican Mafia. That is not her lifestyle; she is a Christian. She does not know if it is a secret organization or has a membership list; she is not part of it. (*See* 5–28–09 EHT at 95–96). Scroggins was at CDCR before petitioner. She showed him the ropes. Her primary job is with the Fontana School District. She and petitioner worked part-time at CDCR. (*See* 5–28–09 EHT at 96–98). They went to school at a program in Redlands through San Diego State as part of continuing education. (*See* 5–28–09 EHT at 98–99).

She has encountered threats by inmates at CYA, though not at her personally. She had never heard petitioner make a threatening statement toward anyone and it would surprise her if he had. (*See* 5–28–09 EHT at 99–100). It would be out of character for him to say, "we know where you live, we know where your family lives." She would disbelieve he even made such a statement. It would be out of character for him to say, "you should be more than scared" to someone on the phone. (*See* 5–28–09 EHT at 100). She has never been to his house, and he has never been to hers. They were not friends out of work unless they went with a group of work people somewhere. (*See* 5–28–09 EHT at 100–01).

### Re-direct Examination

Petitioner never said anything to her about retaliation. She believes that he would have told her if he intended to retaliate. He knew she was a Christian and she preached to him. Retaliation is not in his nature. (*See* 5–28–09 EHT at 101–03).

### Re-cross Examination

She did not believe that because petitioner knew she was a Christian and he was about to commit a very un-Christian act, that was all the more reason he would not tell her; that is not the way friends were. She believes that if he were planning a murder, he would have told her. (*See* 5–28–09 EHT at 103).

### The Court's Credibility Finding

The Court finds Scroggins's testimony creditworthy, but as with Martinez, not particularly probative. Like Martinez, her exposure to petitioner was limited in nature to a work setting where petitioner would have been expected to conduct himself in a non-violent manner. Further, the Court does not necessarily agree with Scroggins that petitioner would have confided in her, a Christian, his intent to commit a murder.

### Nadia Francis

#### Direct Examination

Francis lives in Chino. She was contacted by an investigator of petitioner's current counsel to give information for this case. (*See* 5–28–09 EHT at 105). Francis is an instructional aid in special education at Don Lugo High School in the Chino School District. She was so employed in 2004. She worked with petitioner 5 days a week, 5 hours a day, or longer if the children needed more help. She and petitioner worked together doing homework (with the students), and she helped him

with instruction. (*See* 5–28–09 EHT at 105–06). She was able to form an opinion about petitioner's character. The children were at-risk, they had learning disabilities and behavior problems. Petitioner was always advising them about how to get along. He is against violence. (*See* 5–28–09 EHT at 106–07).

Francis was at court once when petitioner was being tried. She was there to support petitioner and just in case the lawyer asked her to testify to petitioner's character, but he did not ask. Robusto never spoke to her, and none of his investigators did. She was ready to testify in court if she were called. She did not receive a subpoena. (*See* 5–28–09 EHT at 108–09). She is aware he was accused of planning a murder. She did not believe it. He is very loving, very caring. He went out of his way to help the students. (*See* 5–28–09 EHT at 109).

*Cross–Examination*

Francis worked with petitioner since 2003 for about a year and a half. She worked with him until the day he was arrested.[1] He was a teacher and she was an aid. She only knew him through work. They socialized outside of work only one time, at a birthday party for a student. Her recollection of him in 2005 and now is the same. (*See* 5–28–09 EHT at 110–12). She stated in her declaration that he was always in a cheerful mood. After his son was attacked, though, he was sad, upset, and worried until he knew his son was getting better. Petitioner was never violent in school that she recalls. She would expect to see violence from students in special education classroom; special education teachers do get upset but not violent. A teacher would lose his job if he was violent in a special education classroom. (*See* 5–28–09 EHT at 112–13).

1. Petitioner was arrested in February 2005.

*Re-direct Examination*

When she spoke of petitioner being nonviolent, she was speaking about what he demonstrated to her in terms of his nonviolence. (*See* 5–28–09 EHT at 113–14).

*The Court's Credibility Finding*

The Court finds Francis's testimony creditworthy, but again, as with Martinez and Scroggins, not particularly probative. Her exposure to petitioner also was limited to a work setting, and was even more limited than Martinez's and Scroggins's. She also expressly testified that a teacher who was ever violent in the classroom would lose his job.

### Ray Anthony Padilla

*Direct Examination*

Padilla is a retired lieutenant with CDC. He remembers talking to someone after the trial and what he said was put down into a declaration, which he read and signed. (*See* 5–28–09 EHT at 115–16). Padilla remembers petitioner going to trial. He was a potential character witness. He did not speak to Robusto or anyone from his office. (*See* 5–28–09 EHT at 116). At that time, Padilla was working for CDC, as was petitioner. To get a job with CDC, you go through a background check into crimes and past associations. Membership in the Mexican Mafia is not consistent with employment with CDC. Padilla is not saying it has not happened, but it is automatic termination if they find out you affiliate with any gang. (*See* 5–28–09 EHT at 117–18). Padilla has known petitioner for 10–11 years. He also has a familial connection in that Padilla's daughter and petitioner's son had a child together. He knew petitioner for about a year before his daughter and petitioner's son had a relationship. Petitioner. is a nonviolent person, a very happy go-lucky guy.

It would be totally out of character for him to be charged with planning a murder. Nothing has changed his opinion on that. (*See* 5–28–09 EHT at 118–19).

*Cross–Examination*

He and petitioner have been to each other's houses, their sons (petitioner's son, Nathan) played baseball, and they have the connection between his daughter and petitioner's son. He also recommended petitioner for the CYA job. Petitioner was his neighbor; that is how he first met him. His daughters would come over to Padilla's house. He knew petitioner and kept in touch, especially at work. Padilla knew petitioner's wife, two daughters, and sons. He knew them when they were young, then Padilla moved away, and he did not keep much contact with them after that. (*See* 5–28–09 EHT at 120–21). He remembers hearing about petitioner being charged, probably from his daughter, but he does not recall when. With his position, he did not want to jeopardize petitioner by visiting him in jail. (*See* 5–28–09 EHT at 122).

Padilla worked for CYA for 33 years. He knew who the Mexican Mafia were. It is a secret organization insofar as the Mexican Mafia is concerned, but it is well known by CDC, through intelligence, who is a member. He does not know if there are members not known to CDC. (*See* 5–28–09 EHT at 122–23). He has overheard threats just about everyday in his professional experience. He agreed it was fair to say that they are not always direct. If he knew that petitioner had made statements that might be construed as threats to the accusing witness, Padilla guessed it would make him look at him in a different way. He is familiar with petitioner's voice and could probably recognize it on a tape. (*See* 5–28–09 EHT at 124–25).

Padilla is familiar with some gang insignia. He does not recall seeing "C.R." and does not know whether it means, "Crips Rule." He is not sure if petitioner has a tattoo, but believes he does. He does not know if it is a tattoo that reads "C.R." on his left forearm. (*See* 5–28–09 EHT at 147–48).

Padilla does not know where Johnny is. It has been a long time since he has seen him. He went to go see him in the hospital once or twice after he was beaten. He believes he saw him after that. (*See* 5–28–09 EHT 148–49).

Respondent's counsel played a pretext phone call from Gutierrez to petitioner. (*See* 5–28–09 EHT at 152). Padilla believes the person who said, "What the hell?" was petitioner. He did not recognize the other voice. Padilla did not understand what was said. The attorney general replayed the tape. Padilla still did not understand what was said. Assuming what was said was, "we know where you live, we know where your parents live," Padilla did not take that as a threat; he was just telling him he knows where he lives, and he knows where his parents live. That was just information. Padilla was basically able to follow the conversation up to that point and it does not change his opinion about petitioner's character. (*See* 5–28–09 EHT at 152–56).

Padilla heard the last sentence, "You'd better be more than scared" in response to the question, "should I be scared?" It does not change his opinion about whether petitioner is a peaceful man. (*See* 5–28–09 EHT at 156, 158). Petitioner did not sound angry to Padilla; he sounded upset and frustrated. Padilla initially stated he had not heard petitioner more frustrated and angry, but then recalled he was "a little angry" when their children were going to have a baby. He was upset. After Johnny was beaten, he was angry at the perpetrators; he was upset and hurt at what happened. That was natural; Padilla

would have been the same way. He knew he was angry because they were talking. He was upset—somebody almost killed his son. (*See* 5–28–09 EHT at 158–59).

Petitioner was angry at whoever did it. Padilla did not know who did it. At the time of their conversation, there was some speculation about who was involved. Petitioner speculated that it was some gang members or something at a party, but there were no actual names. People knew who they were but were afraid to come forward because of retaliation. (*See* 5–28–09 EHT at 159–60). Petitioner did not focus on the people who owned the home where the party was. Padilla thinks petitioner was more frustrated and angry with people not coming forward than anything else. Petitioner did not say how often he was in contact with police. (*See* 5–28–09 EHT at 160).

Respondent's counsel played a second pretext phone call that occurred right after the first call. When petitioner said, "remember what I said ...," Padilla had no idea what he was referring to—maybe— "once you come up our end, you'll get your tools. Until then, remember what I said." (*See* 5–28–09 EHT at 161).[2]

Padilla reviewed his declaration to refresh his recollection. Regarding paragraph # 5, it was pretty much accurate when he signed it. There were rumors they were gang members (involved); in terms of what actually happened, he did not know. His nephew, who had met Johnny before, was one of the officers on the scene but he did not recognize Johnny, he was so beat up. Padilla may have mentioned to petitioner his nephew was on the scene afterwards. (*See* 5–28–09 EHT at 163–66).

Petitioner was afraid people were afraid to testify against the guys who beat up Johnny and that was going to jeopardize the chances of catching the people who did it. He was angry. Padilla would be angry to. His testimony today is accurate. (*See* 5–28–09 EHT at 166–67). Padilla knew about the rumors of who beat Johnny up through his daughter. She was not with Johnny at the time. Padilla believed that at the time, petitioner did not know what Padilla's daughter knew. He does not recall if the rumors implicated Rashaun Ware or if his name was mentioned. (*See* 5–28–09 EHT at 167).

### The Court's Credibility Finding

The Court finds Padilla's testimony creditworthy. There was nothing about his demeanor or the testimony itself that would cause a reasonable trier of fact to believe that he was testifying falsely. In fact, the Court found Padilla to be an especially impressive witness whose credibility was not diminished on cross-examination.

### Nathan Barco

#### Direct Examination

Nathan Barco,[3] petitioner and Marivel's son, lives in Montebello with his grandmother. Nathan remembers what happened to Johnny and him being taken to the hospital. Nathan visited him every day and ran into Gutierrez a few times there. He remembers times when petitioner and Gutierrez were there at the same time. Petitioner was usually silent; Nathan did not recall petitioner talking directly to Gutierrez. Petitioner was sad, completely devastated about the incident.

---

**2.** Respondent's counsel played a third pretext phone call but made no inquiry of Padilla regarding that call. (*See* 5–28–09 EHT at 162–63).

**3.** Since several members of the Barco family testified at the evidentiary hearing, the Court will refer to them by their first names to avoid confusion.

Usually it was mostly quiet; they were in his brother's room praying for the best because he was on life support. (*See* 5–28–09 EHT at 174–76). Nathan never heard talk of retaliation from his dad. The talk was more about justice. He thought the cops were actually going to pull through. The case still has not been solved. (*See* 5–28–09 EHT at 176–77).

Petitioner wanted Nathan to stay away from violence. As a kid growing up, petitioner told Nathan to try to walk away from the fight; he said it was not worth it and that it should be solved by words. Petitioner was non-violent. Petitioner taught Nathan and his other siblings non-violence. (*See* 5–28–09 EHT at 177–78).

Nathan spoke very little with Robusto. He does not remember him asking Nathan to be a witness in the case. He wanted to go to the trial but was not allowed. (*See* 5–28–09 EHT at 178–79).

*Cross–Examination*

Nathan's understanding of the proceedings today is that his father is innocent and they are trying to defend his innocence. He understands that petitioner could either go back or come home. He would like to see him home. (*See* 5–28–09 EHT at 178–79). He remembers Johnny being in two hospitals. The last time Nathan saw him was a few weeks ago, somewhere in West Covina. From what he knows, Johnny did not ever leave California. (*See* 5–28–09 EHT at 180–81). Gutierrez was not around that much at the hospital. Nathan did not think he was there more than Nathan was, but he could have been around when Nathan was not. Obviously, he does not know what the conversation was when he was not present. (*See* 5–28–09 EHT at 181).

Nathan thinks the family, including himself, started feeling the cops were against them when all this happened. His dad was in prison; the cops who were trying to help them once were now going against them. Nathan thought it was an open and shut case. He was frustrated by nobody coming up. Everybody, including petitioner, shared that feeling. Every night at dinnertime they would have talks about why nobody was doing anything; family members at the dinner table were equally upset. (*See* 5–28–09 EHT at 182–83). Nathan was aware his dad tried to contact the police several times. They said they were working on it, which Nathan did not perceive to be much feedback. He felt they were doing their job but that they could have done a better job. Petitioner felt the same way. (*See* 5–28–09 EHT at 183–84). People would come up to petitioner—they thought street justice was the better way to go. Nathan heard him say, "no." Petitioner refused. He said the cops would take care of it. Petitioner did not lose the faith; he just did not believe cops were doing the full job they could be doing. (*See* 5–28–09 EHT at 184–85). Nathan's brother, sisters, dad, and mom were around the family table during the discussions he earlier referenced. Guerrero was living there and would join them sometimes but Nathan pictured just the six of them around the table. Gutierrez was part of the dinner crowd when Inisha would come over but Nathan does not recall that Gutierrez was present when the family was talking about the problem of not having a suspect. (*See* 5–28–09 EHT at 186–87). Nathan was not aware of gatherings between petitioner, Guerrero, and Gutierrez. (*See* 5–28–09 EHT at 187–88). Johnny's mind was not on retaliation. He did not know what was happening; he was recovering. There was no talk of retaliation. If Johnny said there was, and Nathan was not there when it was talked about, Nathan could not speak to that. (*See* 5–28–09 EHT at 188–90).

*The Court's Credibility Finding*

The Court finds Nathan's testimony creditworthy notwithstanding his obvious familial bias. There was nothing about his demeanor or the testimony itself that would cause a reasonable trier of fact to believe that he was testifying falsely. In particular, his testimony regarding the lack of discussions regarding retaliation was corroborated by Vanessa's trial testimony and testimony of other family members at the evidentiary hearing.

**Vanessa Barco**

*Direct Examination*

Vanessa lives in Alta Loma and is petitioner's daughter. She attends college full-time. (*See* 5–28–09 EHT at 190–91). Vanessa remembers when her brother Johnny was injured in 2004. She saw him in the hospital and her father was always there. She was there when Gutierrez was there at the same time as her father. When she was there, she is sure they (petitioner and Gutierrez) had conversations, but everyone was talking, not just them. She does not know what they were talking about. Her father did not mention getting back at the people who injured Johnny. They wanted to do it the civil way, and she went with him to go through the victims of violent crimes act in the D.A.'s office. An application was made but she does not know what happened. (*See* 5–28–09 EHT at 191–92). While she was present, there was never any talk by petitioner about getting back at anyone for the incident—never. She never heard Gutierrez make suggestions of that sort to her dad in front of her or Johnny. She was there pretty much every day when they switched him from one hospital to the next. (*See* 5–28–09 EHT at 192–93).

She was subpoenaed and called as a witness by the district attorney at trial. She believes she was asked about retalia-tion and what had gone on at the hospital, and her testimony was the same then as it is today. She does not recall whether Robusto talked to her about being a witness. (*See* 5–28–09 EHT at 193–94).

*Cross–Examination*

Vanessa has heard the name Rashaun Ware; the first time she heard it was before her father was arrested. She thinks she heard it from a family member. She heard that it was at his house (Ware's) that the party took place. (*See* 5–28–09 EHT at 196). Vanessa does not recall who suggested filing for victim's compensation. (*See* 5–28–09 EHT at 196–97). She has one child who is nine years old. The father is Donald Knott. He did not give a declaration in this case. (*See* 5–28–09 EHT at 197). At trial, she believes she was asked if she had heard the name Rashaun Ware before. She was also asked about a civil lawsuit. She does not remember Robusto asking questions. (*See* 5–28–09 EHT at 197–98). She mentioned to the jury that petitioner was a teacher at Don Lugo High School and other schools and in prison. (*See* 5–28–09 EHT at 199–200).

*Re-direct Examination*

After she was subpoenaed, they did go talk to Robusto, but "nothing [she] can recall." She remembers the day she had to go to court, she came to the stand and he told her she was going to go up and showed her a paper. He did not contact her to talk to her about what she was going to say. (*See* 5–28–09 EHT at 200–01).

*Re-cross Examination*

Vanessa was not saying that that day in court was the first time she had met Robusto. They went to his office—her father, mother, Vanessa, and Inisha. She does not remember if Johnny was there but does not think he was. Vanessa has

not lived with her family since they took her father, and she has moved around. After petitioner's arrest but before trial, Johnny lived with them but she was never around so she does not know if he was there all the time. She does not know where he was after a certain time. They are a close-knit family. She did not know where Johnny was living because she did not go there a lot. She saw Johnny about a month prior to trial but does not recall when she saw Johnny after trial. (*See* 5–28–09 EHT at 201–04).

*Re-re-direct Examination*

When she met with Robusto, she was just accompanying other people who had business with him. (*See* 5–28–09 EHT at 205).

*The Court's Credibility Finding*

While the Court finds Vanessa's testimony creditworthy, as the Court expressed at the evidentiary hearing, she did not testify to anything that she would have testified to differently at trial had Robusto prepared her better. Further, it was not ineffective for trial counsel not to have called her as a defense witness given her testimony on cross-examination. (*See* 5–28–09 EHT at 205–06).

### David Delmar

*Direct Examination*

Delmar lives in Riverside. The "Faststrip" gas station rings a bell from January 2005. He does not remember a person named Luis. "They" were saying he got hit by a car, but he was drinking that night so he does not remember. He did not see the car come at him. He was told that it did. He does not remember having an argument with a guy. He does not remember any of that night because he was drinking. (*See* 5–28–09 EHT at 129–31). The next day, his body was pretty sore. He did not go to the hospital. He did not get medical treatment. His mom's name is Susan Rodriguez. (*See* 5–28–09 EHT at 131–33). Delmar was with his friend Bugsy from Riverside that night; he does not know his real name. Delmar was affiliated with the Arlanza street gang at that time. Bugsy was not a member of Arlanza and no other members of Arlanza were there that night. He was probably getting some more beer at the gas station. (*See* 5–28–09 EHT at 133–35).

*Cross–Examination*

Delmar does not have any of his own knowledge of when this incident occurred. He was drinking a lot of beer, all day. He probably had more than one six pack but does not know if it was more than two six packs. His memory is impaired by having lots to drink. He is sure it was a Faststrip gas station. (*See* 5–28–09 EHT at 137–38).

*The Court's Credibility Finding*

The Court has no basis for doubting Delmar's testimony that he does not remember what happened at the Faststrip Gas Station, but that he was there and that something did happen. The Court indicated at the evidentiary hearing that the Court would not consider any of the testimony about him being hit by a car for its truth since it was not based on percipient knowledge. (*See* 5–28–09 EHT at 132–33). However, the Court also indicated that the issue was not whether Mr. Robusto would have called Delmar as a witness; he "obviously couldn't have called him." The testimony also went to the credibility to be attached to Inisha's testimony regarding the incident. Parts of Delmar's testimony, including that he was there and a member of Arlanza, corroborated Inisha's story, and therefore suggested she did not make the story up out of whole cloth. (*See* 5–28–09 EHT at 135–36). Thus, even if Delmar could not have been called as a witness at trial, Mr. Robusto still would have been able to interview him to corroborate (at least slightly)

Inisha's account, and to satisfy himself that she would not be confronted on cross-examination with evidence that the incident had not even actually happened.

### Inisha Barco

#### Direct Examination

Inisha lives in West Covina and works in billing. She was acquainted with Luis Gutierrez. She remembers the incident that happened to Johnny and her dad's trial. (*See* 5–28–09 EHT at 207). Robusto asked Inisha to be a witness at trial. He did not prepare her for testimony but said a few things about what she you'e going to be the main one, just be honest. She told him everything she knew about Gutierrez the first time they met and on other occasions. He said they would not believe her. He did not want to hear what she had to say and laughed at her. (*See* 5–28–09 EHT at 207–09).

Robusto did not say he would investigate these things. She thought he was going to, but he said they were not going to believe her. He said they would not believe that he hurt Laura, burned her car, killed someone, ran someone over, that he and his dad went to the forest and killed a person, and that he shot at another guy. Inisha told him everything, wrote everything down. Robusto said he was going to hire an investigator but to her knowledge, he did not. (*See* 5–28–09 EHT at 209–11).

She was living with Gutierrez, then the relationship went bad. Around February 20–23, 2005 was when it was very bad. On the 20th, a Sunday, she got a phone call from her mom, who was at Inisha's aunt and uncle's. Her mom told her they thought Gutierrez was selling drugs. Inisha asked Gutierrez, who laughed but did not respond. She asked him to leave that night, and he said no. He said if she was with someone else, he would kill them both. (*See* 5–28–09 EHT at 211–12). He picked up his belongings, his clothes, Monday. That she can remember, she did not see him again that day. On the 22nd, she asked petitioner to change the locks on her door, which he did. She and Nathan went to her home, and it had been broken into after the locks were changed. As they were walking up, the next door neighbor said Gutierrez was bringing down boxes. The door was broken into, half the wall was off, and everything was messed up. Her daughter's TV, DVD, and VCR and $1000 were gone. (*See* 5–28–09 EHT at 213–14).

Inisha called the Rialto Police Department and two officers came. One asked her if she wanted to press charges and she said no. She then saw Gutierrez walking across her doorway. He asked her what she was doing and told her not to press charges. She called her mom and dad because she was scared. Petitioner wanted her to press charges. She was afraid of what Gutierrez would do if she pressed charges. She made the decision not to press charges when she hung up the phone because she was afraid for her life and her family's. Gutierrez shouted out that if she pressed charges, he was going to say "whatever, whatever about your dad and Alex." She told him to say whatever he wanted because police would not believe him anyway and there was nothing to say. (*See* 5–28–09 EHT at 214–15). She does not remember if police were there when Gutierrez made that statement; she just remembers him shouting it out in front of everybody. That was on Tuesday, February 22nd. She had told them that Gutierrez had lived there and he admitted to police that he had broken into the house. (*See* 5–28–09 EHT at 216–17).

On February 23rd, she "guesses" Gutierrez's car was vandalized. She was not there. (*See* 5–28–09 EHT at 218).

She had Gutierrez's gym set/work-out bench set, and his tool box was at petitioner's house. She does not know of a pistol belonging to him that she or her parents had. She said she was not going to give back anything until he gave back her stuff, and she told petitioner not to give him anything back unless her stuff was returned. (*See* 5–28–09 EHT at 218–21). Inisha had many conversations with Gutierrez about the return of her stuff, but she did not want to deal with him anymore, so she gave the phone to petitioner. Her father was talking to him on the phone while she walked around. Gutierrez got mad because they did not want to cooperate with him after so many phone calls. (*See* 5–28–09 EHT at 221–22).

In her presence, she does not remember that Gutierrez made any other threats about her father. He was not focused on his stuff when he made the statement threatening petitioner at the apartment. (*See* 5–28–09 EHT at 223–24).

Inisha was asked to testify by Robusto but he did not put her on the stand. She was ready. They—her, her mother, and grandmother—went to meet with a private investigator at Robusto's office but he did not show up. They were going to pay for an investigator. She is not sure if her family was billed for investigator services. (*See* 5–28–09 EHT at 224–25).

She recalls an incident at a Faststrip gas station in Riverside. She and Gutierrez went to go put gas in the car. She was in the car and Gutierrez was outside. She heard arguing back and forth and saw him arguing with two other guys. She got out of the car and told him to get back inside. He finished putting gas in the car, got in the driver's seat, and said "'f' that." He drove around and ran into Delmar, who went over the hood of the car. She did not know he was going to hit him. He wanted to do it again, but she said, "no, no, no.

Are you crazy?" The next day he said he went (back) to the Faststrip because he knew the guys who worked there really well and they were going to change the tape just in case the cops went out there. She saw the person who was hit. She went to his work and saw him in the hallway here. She recognized him as the person who was hit. She knew the person Gutierrez was arguing with was from a gang Gutierrez did not get along with. She believes it was Arlanza. Gutierrez was not a member of a gang that she knows of. (*See* 5–28–09 EHT at 226–29, 231–32).

She remembers current counsel's investigator talking to her about some of this. She remembers reading a declaration and signing it. She believes it is the only declaration she has signed in this case. (*See* 5–28–09 EHT at 229–30).

After the burglary, Gutierrez called her many times. He called her at work where she was a receptionist. He asked her when she was going to pick up her guns. She asked him why he was being stupid and said they were his guns. She knew the cops were on the line. He called her job again saying pretty much the same thing. She could not talk at work. (*See* 5–28–09 EHT at 233–35).

*Cross–Examination*

Robusto talked to her about being a witness. That was pending for a while but she does not remember exactly how long. There was a final decision that she was going to be a witness—he told her she was supposed to be a witness. (*See* 5–28–09 EHT at 236–37). She told Robusto a number of things Gutierrez did. She knew about most of these things because Gutierrez told her about them. Besides what he (Gutierrez) did to her, there are no police reports of the other things. She had specific details of the other incidents. They were all written down on paper. She is

certain. (*See* 5–28–09 EHT at 237–38). She met with Robusto a few times—probably more than 12 times. (*See* 5–28–09 EHT at 239–41).

She realized the victim's name was David when she and her mom went looking for someone who had been hit at Faststrip. At the time it (the incident) had happened, she had not seen him before. The next time she saw him was when he was at work, two weeks ago. She is able to recognize him today even though it has been four years. There were lights above in the gas station when it happened. (*See* 5–28–09 EHT at 242–43). They (Inisha and her mom) went around Faststrip, walked around, drove around, asking for him. They asked anybody on the street. She does not remember what specifically led them to David Delmar. She does not remember the date she found out it was Delmar who was struck. It was after petitioner's first court hearing that they found Delmar and she thinks it was after the trial but she is not sure. (*See* 5–28–09 EHT at 243–44). They (Inisha and Marivel) found out where he was located; they found his mom, Susie, in Riverside. (*See* 5–28–09 EHT at 254).

She does not remember if she said the two men approached Gutierrez. The events were fresher in 2005 when she signed her declaration. She saw one guy pull up his shirt, but she did not see anything there. Gutierrez was probably taunted by these two men. If she said that in her declaration, it must have been true. (*See* 5–28–09 EHT at 245–47).

Gutierrez purchased her daughter a DVD player, CD player, and TV for her birthday. Those were the only items Gutierrez took. (*See* 5–28–09 EHT at 248–49).

Gutierrez's Cavalier was parked at her parents' house. She does not know how long it was parked there. She saw that the car was vandalized. (*See* 5–28–09 EHT at 249).

She called Rialto Police Department (after the break-in) and talked to an Asian Police Officer. "Nakamura" sounds familiar. She decided not to press charges. Gutierrez told her if she did, he would go to the police about what happened—but not in those words. She said, go ahead, she did not care. She was scared of him, scared for her life. She was scared even with police right there because she knew if she did anything, he would do something. He told her he would kill her. He admitted breaking into the house. (*See* 5–28–09 EHT at 250–51).

She saw almost none of petitioner's trial. They did not let her in. That could have been because she was under consideration for being a witness. She did not see Gutierrez's testimony at trial. (*See* 5–28–09 EHT at 251).

The night Johnny was attacked, she does not remember if Gutierrez was with her. The night the Ware house was shot, Gutierrez was supposedly working; he was not home with her. (*See* 5–28–09 EHT at 252).

She did not hear talk of retaliation by the men—petitioner and Guerrero—in her household. She never heard anything. (*See* 5–28–09 EHT at 252–53).

Four years ago, she looked different—her weight, hair, and style have changed. (*See* 5–28–09 EHT at 253–54).

*Re-direct Examination*

They found David Delmar just a few weeks ago. They found his mom a few years ago—2005 or something. They never saw Delmar at that time. She does not remember if it was before the trial. (*See* 5–28–09 EHT at 255–56).

She reviewed her declaration. With regard to the incidents in it, she told Robusto about all of them. She gave him all of

the information about Gutierrez and things she knew Gutierrez had done. She wrote that down for him. She told Robusto everything that is in the declaration, and she wrote down for him more than what is in the declaration and gave it to him, towards the beginning. That was in one particular meeting. Every time she saw him, she would remind him, are you gonna say this or that but he did not want to talk about it. She gave him the information in writing but he never discussed it with her. He did not want to discuss anything after she gave him the information the first time. (*See* 5–28–09 EHT at 258–61).

*Re-cross Examination*

Inisha told Robusto about the incidents, but he did not want to hear it. She tried to say as much as she could but he did not want to hear it. (*See* 5–28–09 EHT at 262). She does not know when he was hired. She brought up the same incidents, but he did not want to hear it. She believes she went to court for the preliminary hearing. She told him complaints about Gutierrez in the beginning, when he first got hired. (*See* 5–28–09 EHT at 263–64).

Paragraph 26 of the declaration reflects that in June 2005, she and her mother found Susie Rodriguez. The declaration includes her address. Rodriguez was reluctant to say anything about the incident because her son was already in trouble with police, but she confirmed that he had been hit by an automobile. Inisha believes that she gave that information to Robusto but does not really remember. (*See* 5–28–09 EHT at 264–66).

*The Court's Credibility Finding*

The Court found Inisha Barco to be a difficult witness, but nothing about her testimony was inherently improbable or unbelievable, and the Court generally finds her testimony creditworthy. The Court does not believe that she testified falsely, or that a jury would have so concluded. The descriptions she gave about the incident at the gas station and Gutierrez's break-in of her apartment, in particular, were very detailed and creditworthy. While she was sometimes unruly on the stand—giving lengthy, narrative answers—the Court is convinced that competent defense counsel would have been able to better prepare her for testifying at trial than habeas counsel prepared her for this evidentiary hearing. Aspects of her testimony regarding identifying incidents for trial counsel were corroborated by her mother and trial counsel himself, with the only discrepancies being whether she gave trial counsel an actual list of the incidents and when David Delmar and Susan Rodriguez were discovered. Since no such list was included in the notes and records turned over by Robusto and the Court has no reason to believe that Robusto would have withheld or destroyed such list if it had been turned over to him, the Court suspects that Inisha and her mother were referring to a list subsequently prepared and turned over to habeas counsel, not Robusto. However, the Court does not find this discrepancy in Inisha's testimony to detract from overall credibility, but rather attributes the discrepancy simply to misrecollection and confusion on her part. Further, whether Inisha actually identified Delmar and Rodriguez to Robusto during trial is not the issue in this Court's view, as described in the Report and Recommendation. On balance, the Court finds that as an objective matter, the benefits of calling Inisha outweighed the negatives, given the incidents about which she had personal knowledge.

### Marivel Barco

*Direct Examination*

Marivel lives in La Puente. In August 2004, her son Johnny was injured. She found out the next day. He was at Gen-

eral Hospital for about three days, then Kaiser in Hollywood until sometime in September, then Kaiser in Fontana for rehabilitation for two to three weeks. (*See* Transcript of May 29, 2009 Evidentiary Hearing ["5–29–09 EHT"] at 21–22). She was at the hospital every day, as was petitioner. She was not employed at that time. Petitioner would go to school, then come back around 3:00–4:00 p.m. and they both stayed overnight. Then petitioner would go home, change, shower, then go to work. She saw Gutierrez at the hospital. She was not sure how many days he was there, but he was there a lot. (*See* 5–29–09 EHT at 23–24). She was always around petitioner; they never left each other's side. She saw Gutierrez speak to her husband; they spoke to him every time they saw him. Gutierrez did not talk to her about retaliation against the people who injured Johnny or talk to petitioner about retaliation at the hospital in her presence. (*See* 5–29–09 EHT at 24–27). While she was present, her husband did not talk about retaliation to anyone at the hospital. (*See* 5–29–09 EHT at 28–29).

During February 2005, Inisha and Gutierrez were having problems. Around February 19th or 20th, Marivel, in Victorville, got a telephone call from Inisha regarding the fact that she and Gutierrez were arguing and not getting along. Marivel told Inisha to go into their room, away from Gutierrez. Marivel's sister-in-law and brother thought he must be "doing something." (*See* 5–29–09 EHT at 29–30). The next day, Inisha asked petitioner to change the locks on her door so Gutierrez would not come back, which petitioner did. Marivel took Inisha to work. She went to Inisha's house that day, after the locks had been changed, and saw the door broken down and things messed up. It was her impression that Inisha's place had been broken into. Something was broken on the door, that was visible. (*See* 5–29–09 EHT at 31–33). Her granddaughter's brand new TV and DVD were gone. That is all she recalls. After that, they called police—she was not present when police were called. Marivel went there after he broke the door down, but could not recall whether it was the same day of the break-in. (*See* 5–29–09 EHT at 32–36).

Gutierrez started calling her house the day after he moved out of Inisha's apartment. The first phone call was the same day as the break-in. Marivel recognized his voice, and he identified himself. Gutierrez said he wanted to talk to petitioner because he wanted his belongings. They had his tool box, weight workout bench, and .25 caliber revolver. (*See* 5–29–09 EHT at 36–40). Marivel listened on the other line while Gutierrez was talking to petitioner. In the first conversation, Gutierrez told petitioner he wanted his belongings back and if petitioner did not return them, he would somehow get him. He said he would talk to West Covina police and say petitioner was involved. Petitioner told him he would get his stuff back when he returned Inisha's things. (*See* 5–29–09 EHT at 40–42, 44). Gutierrez called every day maybe six or more times a day. The calls stopped and then started up again, and he called every day until they arrested petitioner. (*See* 5–29–09 EHT at 42–43). She understood that if he got his stuff back, he would not go to police. (*See* 5–29–09 EHT at 45). Petitioner did not agree to give Gutierrez his stuff back. Marivel always picked up the phone and then stayed on the line. (*See* 5–29–09 EHT at 46–47).

Marivel and her mother-in-law were present when Robusto was retained, March 9th or 10th of 2005. (*See* 5–29–09 EHT at 48). Inisha was there on some occasions. Marivel was present when Inisha told Robusto certain things about Gu-

tierrez. Inisha gave him everything in writing and talked to him about it. She talked about Gutierrez running over Delmar, wanting to go buy a gun, him mentioning that he killed somebody, breaking into her apartment and taking her belongings, his altercations and problems with another girlfriend, Gutierrez's cousin getting beat up and how he went after that person. She also mentioned a satellite salesman and guns. (*See* 5–29–09 EHT at 49–50).

Marivel spoke to Robusto about investigation of the case. She asked him if he was going to have an investigator and told him there would be funds for one. He said he was going to find someone and they were to meet him in his office. (*See* 5–29–09 EHT at 50–52). They talked about investigating Gutierrez. They gave Robusto a list of witnesses. They named Laura Frausto, David Delmar, and Susie Rodriguez and told him about the incidents involving each of these people. They also brought up "Raymond" (not Padilla), Ray Padilla, Cindy Martinez, Lucy Rios, someone named Knott, Nadia Francis, Ms. Scroggins, Wanda McBride, Michael Gabriel, and her son Nathan. They told him what those witnesses would be able to talk about. (*See* 5–29–09 EHT at 52–55). Marivel talked to Robusto about these individuals at different times. She estimates she saw Robusto about 12 times. She was always accompanied by someone, usually petitioner's mother, Rosemary. When petitioner was out on bail, he went too. After they gave him the witness names, Robusto said he would get an investigator. To her knowledge, he never did. Marivel, accompanied by Rosemary, had an appointment with Robusto to meet the investigator before trial—maybe sometime in May, about three months after they hired Robusto. (*See* 5–29–09 EHT at 56–59). They did not meet the investigator. He never showed up. Robusto was there. Robusto said he (the investigator) was not going to make it but he did not answer her when she asked "why not?" Robusto did not schedule another meeting and did not tell her why there was no other meeting. She never met any investigator. She was able to speak to the witnesses she listed. None of them said an investigator from Robusto's office had come to see them or that they had talked to Robusto. (*See* 5–29–09 EHT at 59–60).

In February, Gutierrez's red Cavalier was parked outside her home; it was not running. When she went outside one morning, she noticed the windows were broken. She called police, who took the report and told her they would send somebody from Fontana but it would be a while. (*See* 5–29–09 EHT at 61–62). Gutierrez came by before police arrived. He saw his car windows were broken. He was upset and started blaming them—he said they were "going to pay" for this and he would be calling police. He threatened that he was going to go after Inisha. He "planned" to kill Inisha. Marivel clearly heard that. Marivel told him to go ahead and call police since she had already made a police report. By that date, she had already received phone calls from Gutierrez. After that, his uncle took him to the gas station and left him there. When his uncle came back, Marivel asked where Gutierrez was. His uncle said Gutierrez did not want to be there when the cops arrived because he did not want to be arrested for the threats he had made. The police came around maybe 4:00 or 5:00. She told them what she found and whose car it was. They completed a report and remained there for a period of time. The uncle, who had a tow truck, took the car while the police were there. She does not recall if Gutierrez mentioned the car again. (*See* 5–29–09 EHT at 61–65).

After the incident with the car, he made more phone calls where he threatened to call police if he did not get his stuff back. He stopped making the calls after her husband was arrested. (*See* 5–29–09 EHT at 65–66).

Marivel never heard petitioner threaten to retaliate. He never discussed retaliation either at the hospital or at the house in her presence. Robusto never visited the house to look at the layout or rooms and never sent investigator to look. She recalls character witnesses being in court but Robusto never talked to any of them. Marivel told him Padilla worked for the CDC, and that Scroggins worked for the CDC and that she and petitioner were co-workers. She also told him about Francis and her relationship to petitioner. They talked to him quite often about investigation and witnesses. It did not appear that he was going to investigate. When she brought the issue up, he did not want to hear it. Robusto said he was not going to use the character witnesses because he did not want to "re-hash" everything in court. (*See* 5–29–09 EHT at 66–69).

*Cross–Examination*

Marivel was subpoenaed as a witness by the prosecution, and so was Inisha. She does not know what the prosecution wanted to hear from her, and she does not recall whether Robusto discussed that with her. (*See* 5–29–09 EHT at 70).

Gutierrez was "always" at the hospital. Marivel was always at the hospital, the rehabilitation center, and Kaiser. Petitioner was sometimes working, but he sometimes did not work at YA so he could be at the hospital. (*See* 5–29–09 EHT at 70–71).

The money that Gutierrez took out of the apartment was Inisha's money; it was not money Gutierrez had left for rent. Inisha worked and Gutierrez was not pay-ing the rent according to Inisha. (*See* 5–29–09 EHT at 71–72).

Regarding the vandalism to Gutierrez's car, she called police and not Gutierrez because she had "had it" with Gutierrez; he just kept calling. Marivel did not know if Gutierrez had given Inisha the car, but she was using it except for the period it was broken down. Marivel does not recall why the car was parked at her house. (*See* 5–29–09 EHT at 72–73). Marivel recalled telling Robusto about the vandalism to the car. She does not recall if it was put in writing. It was important for Robusto to have a written list of all of the problems Inisha had (with Gutierrez)—he wanted it, so they gave it to him, she is certain. Her declaration does not say that she provided Robusto with a written list. (*See* 5–29–09 EHT at 73–75). She does not remember if she read the written list of incidents before it was submitted to Robusto; how long the list was; if it had details; if it was handwritten or typed; or if they made a copy. (*See* 5–29–09 EHT at 79–80).

Johnny was interviewed by the police but Marivel does not remember what he said. She does not recall whether Robusto told her that Johnny had said petitioner was involved. Nor does she recall if Robusto told her that if Johnny were in town, he was going to have to testify to what he told police. She did not recall whether she helped Johnny get out of town so the prosecutor could not find him. She does not know where Johnny was during the trial. She did not send him to Chicago or tell Robusto that she had. (*See* 5–29–09 EHT at 76–78).

Regarding paragraph 20 of her declaration, as it stated therein, it is true that Robusto told them that if they used "these people as character witnesses, the prosecution was going to rehash everything, and that would cause the jury to think about it

all again." He also said their testimony would not make a big difference to the jury. She does not remember that independently but it was true when she signed the declaration. (*See* 5–29–09 EHT at 80–82).

Marivel does not remember whether Robusto and other family members had a long discussion about whether to use character witnesses. Her recollection was not refreshed by the suggestion that they did have a long conversation right outside the courtroom lasting almost an hour. She does not recall Robusto saying he wanted her input on whether to use the character witnesses. It does not refresh her recollection that at the same time, they were talking about whether petitioner would testify. Marivel does remember a discussion about whether petitioner would testify. Robusto made the decision regarding whether petitioner would testify. She was present when he was talking to petitioner. It is not true that Robusto and petitioner agreed that he would not testify. Petitioner wanted to testify. She does not know if Robusto forbade him from testifying. She does not know why he did not testify if he wanted to. She was present during the conversation but does not recall everything and does not remember them weighing the pros and cons of petitioner testifying. (*See* 5–29–09 EHT at 82–84).

They wanted the people present in the courtroom as character witnesses; they wanted Robusto to meet them. They called them, and told Robusto they were doing that. She does not remember a conversation about whether they would testify. (*See* 5–29–09 EHT at 84–85).

*Re-direct Examination*

The day the trial witnesses were in the hall, they did talk to Robusto about the case. He was not easy to talk to or to give input to about trial tactics. He said to just leave him alone; he did not want to hear about it and would shoo them away. She now recalls they had a discussion about character witnesses—they wanted them up there, Robusto said "no." He did not say there were upsides and downsides, and it was up to them to decide. (*See* 5–29–09 EHT at 85–87).

Marivel does not remember whether she gave David Delmar and Susie Rodriguez's address to Robusto. When she found them, she believes it was after trial and after petitioner's current counsel was hired. (*See* 5–29–09 EHT at 90, 92).

Johnny was questioned by police the day they did a search warrant on her house. She believes it was March 3rd, the day petitioner was arrested. Johnny suffered from head injuries, and after the incident, he lost his short term memory; he was unable to walk; and he was confused. (*See* 5–29–09 EHT at 91–92).

*Re-cross Examination*

Susan Rodriguez was located after petitioner's trial; she was not located in June 2005. Petitioner's trial was in August 2005. Robusto was relieved shortly after petitioner's conviction. (*See* 5–29–09 EHT at 93).

Johnny was interviewed three separate times by police, and he was living at home during those times. None of the testimony refreshed her recollection as to a discussion between herself and petitioner concerning Johnny's testimony. The discussion about character witnesses refreshed her recollection about the decision regarding whether petitioner would testify, and there was a discussion about that. (*See* 5–29–09 EHT at 95).

*The Court's Credibility Finding*

Like Inisha, Marivel seemed unprepared for her testimony at the evidentiary hearing. Again, however, the Court finds that competent trial counsel would have been able to better prepare her to testify. Her

statements regarding the lack of discussions regarding retaliation were corroborated by other family members. Nothing about her testimony was inherently improbable or unbelievable, and her demeanor was appropriate.

### 2. *Respondent's witnesses*

#### *Martin Bean*

##### *Direct Examination*

Bean is a deputy district attorney for the L.A. County D.A.'s office in the hard core gang division. His tenure with DA's office is more than 10 years. In 2005, he was assigned in Pomona to general felony trials. He has tried 99 felony trials and has seen character witnesses called in maybe five of them. (*See* 5–29–09 EHT at 107–09).

Bean prosecuted the case against petitioner. The police reports were disclosed to Robusto, as were video and audio tapes. (*See* 5–29–09 EHT at 109–10).

Bean is familiar with the name Nathan Barco. Bean was certain that he and Robusto discussed potential witnesses that would be called but is not certain they discussed character witnesses and the names of particular character witnesses were not given to him. Bean found no bad acts, negatives, or prior convictions by petitioner that he might have used against a character witness. (*See* 5–29–09 EHT at 110–12). It was undisputed that petitioner was a teacher and had a family. Bean's theory was not that petitioner was attacking people on a regular basis but that the fact of his son's injury caused him to do these acts. The fact that these people saw him as a decent person did not negate the theory of the case in Bean's mind. The second aspect of impeaching the character witnesses was to go through their motive to say what they were saying and their opportunities to observe petitioner through

his life rather than in just one aspect of his life. (*See* 5–29–09 EHT at 112–13).

With a witness like Nathan, had he testified that petitioner's attitude toward violence was to stay away from it and that he imparted that to his kids, Bean would have elicited testimony regarding his relationship with petitioner—i.e., that petitioner was his dad; that he loves his dad; and that his dad was facing charges that could take him out of the home, which Nathan did not want to happen. Then, Bean would go into how petitioner did not discuss everything in his life with Nathan, and would not point out the bad things he was doing. (*See* 5–29–09 EHT at 113–14).

If the witness himself appears non-violent, that went into it (his theory) because Bean's theory was not necessarily that petitioner was violent himself in the sense that he did not go out and commit the crime himself. In Bean's mind, the character traits of someone who actually commits the crime are different than those of the person who asks someone else to do it. The fact that someone would eat duck, for example, does not necessarily mean he would kill the duck himself. He would have argued to the court that violence is not a relevant character trait in this case. (*See* 5–29–09 EHT at 114–15).

Regarding Martinez, had she testified at trial consistently with her evidentiary hearing testimony, Bean would have gone into motive and opportunity to observe. He would have established their close connection, the positive benefit her son received from him, and the negative impact on her life if he were convicted. He would go into whether Martinez spent time with petitioner outside of the classroom, or saw him in his daily life and how he interacted with others. If she appeared very pleasant and non-violent, Bean would inquire how well he knew her and whether she was the type of person he could expect to

carry out a crime for her. He would have asked that of Nathan too. The point is petitioner would have gone to someone less savory. (*See* 5–29–09 EHT at 115–19).

Bean reviewed the declarations of the character witnesses. Regarding Scroggins, he would have explored how she knew petitioner was a good family-loving, God-loving man, and whether he talked to her about Rashaun Ware and whether he mentioned to her blaming him for the crime. He could have called numerous rebuttal witnesses to say that petitioner did blame Ware; so if she did not know that, she was not that close to him or was holding back. (*See* 5–29–09 EHT at 121–22). Regarding Francis, he would have gone into her opportunity to observe petitioner, her closeness to petitioner, and motive. Bean did not doubt that she saw what she said about his interactions with special education kids, but the cross-examination would have been about the rest of his life. (*See* 5–29–09 EHT at 123–24). Regarding Padilla, he would have gone into motive, his relationship with petitioner; and the grief his family would suffer if petitioner were held accountable. The fact that he was in law enforcement suggested petitioner would not have been likely to commit violent acts in front of him or tell him or ask him to commit crimes. (*See* 5–29–09 EHT at 124–25).

Bean reviewed the tape of the conversations between Gutierrez and petitioner. He would have asked the character witnesses if petitioner is the kind of person who would make threats, then he would have played those segments of the tape after asking if the witness's opinion of him would be changed. He would have done it with witness who would have been most shocked by the statements. Padilla probably hears language like that a lot and might converse with petitioner less formally. The tape would have been more likely to alter the opinion of the nurse or teacher's aide. (*See* 5–29–09 EHT at 125–26). If a witness does not say that his or her opinion is changed and is not even convinced they were threats, the game is not lost because the jury will draw its own inference about whether they were threats. (*See* 5–29–09 EHT at 126)

Had the character witnesses testified, Bean would have argued in closing that his theory of the case was not that this was some gang member who was regularly beating up, threatening, and killing people; he loves his family, cares for them, and would do what he could for them. Something bad happened to his son and because of those circumstances, he did this. The statements that he was not a violent person were right—he did not go out and shoot someone himself. He may not have had the ability or strength to do it himself, but he got someone to do it to take care of his family. Luis Gutierrez is who you go to to carry out a crime, not these character witnesses. You do not turn to the people at school, people you work with; you turn to people who are unsavory. (*See* 5–29–09 EHT at 127–28).

*Cross–Examination*

He does recall what witnesses Robusto called at trial. Cal. Evid.Code § 1054 requires you to disclose statements of witnesses you intend to call, 30 days before trial. Witnesses by the defense are sometimes not given 30 days in advance, but Robusto did have to tell him who he was going to call. (*See* 5–29–09 EHT at 128–30).

The testimony of Luis Gutierrez, and his mother and girlfriend, who corroborated him, were critical parts of the case. Bean cannot recall if the jury asked to be escorted after the case because of Mexican Mafia involvement. (*See* 5–29–09 EHT at 130).

*Re-direct Examination*

The cell phone evidence played a part in corroborating Gutierrez's testimony. All family members denied having received a phone call, or at least, no one admitted it during police interviews, but cell phone records indicated Guerrero called petitioner at home an hour before the crime from Ontario to the house phone.[4] Bean does not recall whether more than one phone call was made. (*See* 5–29–09 EHT at 130–31).

*Re-cross Examination*

Bean does not recall whether it was one phone call the phone company broken into two parts. (*See* 5–29–09 EHT at 132).

*The Court's Credibility Finding*

The Court finds Bean to be credible. Insofar as the Court finds that it was not ineffective assistance of counsel to fail to call Scroggins, Martinez, and Francis as character witnesses because their direct testimony by itself was simply not that probative, Bean's testimony regarding how he would have impeached them simply reinforces the Court's analysis on that point. To the extent Bean testified regarding how he would have impeached Padilla, the Court's view that Padilla would have been a strong character witness for petitioner is unaltered. Moreover, it is not even clear that Bean, like respondent's counsel at the evidentiary hearing, would have played the audio-taped calls between petitioner and Gutierrez for Padilla, since, as Bean indicated, Padilla would have been exposed to that kind of language in his long career in law enforcement and may not have been so affected by it. Likewise, the Court's view that Nathan Barco would have been a good witness for petitioner at trial, particularly with respect to the issue of the lack of retaliation talk, is unaltered by Bean's likely cross-examination of him. Further, as the Court pointed out at the evidentiary hearing, Bean's statement that he would have elicited testimony from Nathan that his father would not have solicited him to commit the crime (or told Nathan of the "bad" things he does) detracted from Bean's testimony in light of Gutierrez's testimony that petitioner, in fact, spoke of retaliation in front of all family members. (*See* 5–29–09 EHT at 119–20). Further, Bean's likely closing argument, specifically that Gutierrez was the type of person (i.e., unsavory) petitioner would have approached to commit the crime instead of any of the possible character witnesses was not consistent with the presentation of evidence at the trial given that Gutierrez's "unsavory" character did not come before the jury.

**Roger Nakamura**

*Direct Examination*

Nakamura is employed with the City of Rialto Police Department. He has been there over 12½ years and was working there in February 2005. (*See* 5–29–09 EHT at 133). Nakamura reported to an apartment occupied by Inisha Barco on February 21, 2005. He can recall bits and pieces. He refreshed his recollection with reference to the call history. (*See* 5–29–09 EHT at 133–34). He responded to two calls. The first call was a "keep the peace" call, and the caller's name was Luis Gutierrez. Gutierrez advised that he needed assistance to get his vehicle from his ex-girlfriend. Nakamura made contact with her; she was upset with him (Gutierrez) because there were issues with property that might have been taken. After speaking to both parties, he deemed it a

---

4. The trial transcript reflects that the phone call was actually from the Barco residence to Guerrero's cell phone. (*See* 4 RT 1026–29).

civil dispute between the parties. (*See* 5–29–09 EHT at 134–35). The second call was Inisha Barco trying to report a residential burglary. After talking to her and Gutierrez, it was deemed a civil problem. She did not want to file charges after he spoke to them extensively. She wanted her property back. Gutierrez wanted his vehicle and to leave. (*See* 5–29–09 EHT at 135–36). Gutierrez was pretty calm during those two contacts. Inisha was a little more irate, more upset. No police report was made and there was no arrest. (*See* 5–29–09 EHT at 136–37).

*Cross–Examination*

Neither Robusto nor his office ever contacted Nakamura. (*See* 5–29–09 EHT at 137).

*The Court's Credibility Finding*

The Court finds that Nakamura was credible. The testimony corroborated Inisha's testimony that Gutierrez had broken into her apartment and that she had reported it to the police.

### Anthony Robusto

*Cross–Examination* [5]

Robusto's memory of this case is better now than in June 2008—when his deposition was taken—because he had not had the opportunity to review any documents or transcripts. He did that before today's testimony. (*See* 5–29–09 EHT at 140–41).

Robusto received police reports from the district attorney's office (Respondent's Exhibits A–K), and received and reviewed the videotaped interviews with witnesses, including petitioner, Johnny, and Inisha. He also received audiotapes of pretext phone calls from Gutierrez to Inisha, petitioner, and Marivel. (*See* 5–29–09 EHT at 142–45).

Robusto has no policy against calling character witnesses; he has done it in the past. In this case, he did not call them because petitioner decided not to testify. In his mind, the character witness testimony would have been flat and shallow. He based his opinion on what he understood the witnesses' testimony would be, which he learned from the family. (*See* 5–29–09 EHT at 145–47). Had petitioner testified, Robusto would have been more likely to put on character witnesses as they would have supported his veracity. But when the defendant does not testify, there is a black hole; jurors get cognitive dissonance. (*See* 5–29–09 EHT at 147). He made a final decision not to call character witnesses and whether petitioner would testify just before the end of trial. They had taken a lunch break and Robusto conferred with Marivel, petitioner, and Inisha. Robusto had not indicated to the prosecutor that he would be calling anyone. (*See* 5–29–09 EHT at 148–49). The family did not insist on character witnesses. The witnesses were there and could have been called. They discussed his reasons for not calling them, and the Barcos ultimately agreed with his position. Petitioner and Marivel had made arrangements for the witnesses to be there on that date and time, so they were in a position of calling them. Robusto knew they were coming to court. (*See* 5–29–09 EHT at 149–50).

It was petitioner's decision not to testify. Robusto recommended he not testify, but told him it was totally his choice. The pretext phone call had not been admitted, but Robusto thought the prosecution might get them in rebuttal if he testified. He was worried about petitioner's statements being implied as threats when they would be propounding to the world he was

---

**5.** Petitioner moved to admit the deposition testimony of Mr. Robusto as the direct examination. Where the deposition testimony differs from his testimony at the evidentiary hearing, the Court has so indicated in footnotes.

a peaceful person. Robusto also had difficulties with the quality of petitioner's testimony as a witness. He had made a statement during his interview with law enforcement that if the father of the victim were hurt, he would not feel bad. (*See* 5–29–09 EHT at 150–52). Petitioner did not do well in role-playing with Robusto on practice examination. (*See* 5–29–09 EHT at 152–54).

If the tape had been played for the jury, it would have been up to the jury to assess. The witness either looks silly saying it does not change his opinion of petitioner, or if he says it does change his opinion, then what is the point of putting on the witness? There was no way for the prosecution to get in the tapes if he had not presented a defense. (*See* 5–29–09 EHT at 152). Petitioner had a clean record, and Robusto struggled with the benefit he would receive versus the mileage the prosecution would get out of character witnesses. He called a good lawyer friend, David Daugherty, and discussed it with him. Robusto then finalized his decision that the character witnesses would not be beneficial. (*See* 5–29–09 EHT at 154–55).

It did not matter who the particular character witnesses were. The trial at the beginning was about the Ware family, and their tragedy, and then it moved to the nuts and bolts of what happened and Gutierrez took the stand. Everybody felt they had done very well on cross-examination of Gutierrez. Robusto did not want the focus of the trial to change. Bean could potentially have started talking to these character witnesses about what was presented through Gutierrez; were they surprised; would it change their opinion.

Robusto had experienced that with character witnesses before. The momentum would have been shifted from Gutierrez back to what petitioner allegedly did. (*See* 5–29–09 EHT at 155–56).

Robusto recalls making arrangements to have an investigator meet with him, Marivel, Inisha, and maybe petitioner's mother at the office.[6] The investigator he was going to use was Lawrence DeLosh; he had used him for approximately 5 years. Robusto found out that same day that DeLosh had been retained as Guerrero's investigator. Robusto wanted to get the information (from the Barcos), so they proceeded to do an extensive interview. (*See* 5–29–09 EHT at 157–58). Robusto did not ask the Barco family for a written list of incidents involving Gutierrez and is certain he did not receive one. He did receive a recitation of incidents from Inisha. The primary incident Robusto remembered related to Gutierrez going into Inisha's residence and taking property. (*See* 5–29–09 EHT at 159). Inisha talked about other incidents involving Gutierrez—Gutierrez had told her about assaultive behavior that he was involved in—a murder or two and Gutierrez striking somebody with a car. (*See* 5–29–09 EHT at 160).

Inisha's accounts were consistent; Robusto always heard the same thing.[7] Robusto asked Inisha if there was independent evidence of the bad acts and she could not provide any. She believed the incidents happened because that is what Gutierrez told her; there were no arrests. Discovery showed Gutierrez was crime free—maybe one minor misdemeanor. Inisha could not tell Robusto where or when they took place, or where he would go to

---

**6.** At his deposition, Robusto did not recall scheduling a meeting with an investigator and family members. (*See* June 16, 2008 Deposition ["Deposition"] at 13).

**7.** At his deposition, Robusto testified that Inisha was all over the place in her interviews with him. (*See* Deposition at 46).

investigate. This was discussed multiple times with Inisha and the family. (*See* 5–29–09 EHT at 160–61). Robusto estimated he spent 15–20 hours in his office or in court with the Barco family; about a dozen meetings. He visited petitioner in the county jail. He never met with Inisha alone, she was always with a family member. (*See* 5–29–09 EHT at 161–62).

Robusto was told Gutierrez ran over a gang member at a gas station, liquor store, or mini-mart in Riverside. It was something he could use to impeach Gutierrez. Robusto's theory was that Gutierrez was involved in the shooting-he could have been a perpetrator. Any acts of violence he could confront him with and prove were consistent with the theory that he could have done this and was violent. He did not pursue the gas station incident because he had no place to—there are a lot of gas stations in Riverside. They did not say it was a Faststrip and Inisha did not know the date it happened. She did not say she had talked to police about it. (*See* 5–29–09 EHT at 162–63).

Robusto also did not think that Gutierrez's account to Inisha about the things he had done was credible. There was no indication any of it was true. With better information, he would have investigated Inisha's allegations. You have to send an investigator someplace. (*See* 5–29–09 EHT at 163–65).

Robusto did not find it reasonable or plausible that someone would pin a murder on someone else for $1,000. He did not think a jury was going to buy that. He was not told Gutierrez's car was vandalized at the Barco house. He did not think it would have made him want to go after motive. (*See* 5–29–09 EHT at 165–66). In Robusto's opinion, the best motive was

that Gutierrez was part and parcel of the killing; that he was a perpetrator involved in it and was trying to dodge arrest and conviction by blaming petitioner and cooperating with police. The theory was that the second person seen in the car by the reserve police officer could have been Gutierrez. Robusto explored the fact that Gutierrez had been granted immunity. Other attorneys might have seen the issues differently. (*See* 5–29–09 EHT at 167–68).

Robusto spoke to Guerrero after the trial. Robusto had been informed by the Barcos that Guerrero would provide a declaration that petitioner was not responsible for or involved in the shooting, but he did not do so. (*See* 5–29–09 EHT at 169–70).

Marivel was subpoenaed by the prosecution, he assumes to corroborate what Gutierrez had said (i.e., statements incriminating petitioner) because you need to corroborate the testimony of an accomplice. The prosecutor could have used Marivel, Inisha, or Vanessa to do that.[8] Had Robusto put those witnesses on, the prosecutor could have used them for that reason. Marivel did not want to testify and exercised her marital privilege. Inisha was also under subpoena. (*See* 5–29–09 EHT at 171–73, 175). With respect to Inisha, there was the issue of the gun—possession of it, obtaining it, bringing it to the Barco residence—things she stated in the police report that were inculpatory of petitioner. Robusto does not have a memory of what Marivel would have said or not said. (*See* 5–29–09 EHT at 173–74). Marivel would have been a good character witness, but a family member is always subject to attack. (*See* 5–29–09 EHT at 174–75).

---

**8.** At his deposition, Robusto testified that his memory was that most of the conversations about which Gutierrez testified were one-on-one. (*See* Deposition at 41).

Johnny admitted in police reports that he had overheard his dad involved in this plan. It is Robusto's understanding that the prosecution did not call Johnny because he had vanished. Robusto talked to petitioner and Marivel about Johnny's statements. They were not shocked or angered, it was just, "What do we do? This isn't good." Robusto thought a son saying that his father did criminal acts sounded pretty believable and it was on video tape. Based on Robusto's review of the videotape, he could not have said that Johnny did not know what he was talking about due to his accident 5 months before. If Johnny took the stand and denied it, he would have been impeached. (See 5–29–09 EHT at 175–77).

Robusto was concerned the prosecutor might crack one of these witnesses and get them to say something they heard, but conceded he did not know, exactly, what the witnesses would have said if they had been asked whether they had heard any discussions about retaliation at the dinner table or hospital. Robusto had stated at his deposition that the way to prove a negative is to call other people who were present when the conversations took place. (See 5–29–09 EHT at 179–80).

As a witness, Marivel was solid, clear, and had a distinct recollection of events. Inisha was not a good witness—every time he talked to her, it was a different story; he could never get a concise, consistent statement from her. In the videotaped interview, she ran on and refused to answer questions. (See 5–29–09 EHT at 180–81). With respect to the gun issue, Inisha participated in the purchase of a gun, and the allegation was that petitioner was looking for a gun. Inisha could be charged with aiding and abetting and/or conspiracy to commit murder. He interviewed Inisha about Gutierrez's statements about the purchase of the gun. (See 5–29–09 EHT at 181–83).

If Robusto had had particulars about any of the acts that made Gutierrez look violent or bad, he would have pursued investigation. He did not have those particulars. (See 5–29–09 EHT at 181).

Robusto thought the decision to rest the defense case on cross-examination of Gutierrez and on argument was sound. He felt that Gutierrez was not believable and thought the jury would not believe him. That, combined with the information that he could have been in the car, had something to hide, and was part of the crime, was sufficient. (See 5–29–09 EHT at 183–84).

*Re-direct Examination*

Robusto now recalls the scheduled meeting with DeLosh. He conducted what he considered to be a pretty extensive interview of Inisha. (See 5–29–09 EHT at 187). Regarding the incident at the liquor store, Inisha did not say she was there; she said Gutierrez told her this took place. He is certain of that. He took notes of the interview. (See 5–29–09 EHT at 188).

Robusto turned over his file to petitioner's current counsel, which included everything but his notes. (See 5–29–09 EHT at 188–91).[9] Robusto does not recall asking Inisha or any other witness about Gutierrez's prior girlfriends and does not remember the name Laura Frausto. He also did not know about the person who was hit because there was no investigation of the incident. He never sent an investigator to talk to Michael Gabriel and does not remember if he knew of him. He knows of

---

9. Robusto was ordered to turn over his notes, and a telephonic conference was set up to discuss the potential need for additional testimony based on those notes. (See 5–29–09 EHT at 205–11). Robusto was recalled for further testimony on July 24, 2009.

the character witnesses who were in court but he did not interview them or ask them any questions, and did not find out what they would be able to testify to. He did not check to see what kind of witnesses they would make or if they had useful information. Robusto believes he was aware that two of them were CDC employees. That could possibly have been useful on the issue of the Mexican Mafia. (*See* 5–29–09 EHT at 191–93).

Robusto was not aware that members of the jury asked to be escorted to their cars because of the Mexican Mafia. He did not tell Marivel and petitioner's mother that. He did not interview the jurors after trial. (*See* 5–29–09 EHT at 193–94).

Most of the time, he does an investigation either through an investigator or himself. He was told money was available to hire an investigator. With unlimited funds and only one witness against his client, it still was not good practice to hire an investigator just to see what he could dig up—you cannot just give him a retainer and tell him to investigate. Robusto had no information about any people. He had information that Inisha was told certain things by Gutierrez. (*See* 5–29–09 EHT at 194–95). Robusto had no information that Gabriel had information to offer. He talked to Marivel about possible witnesses; his memory is that she and Gutierrez had a good relationship and they were friendly; she did not provide information on Gutierrez that was helpful. The threats made by Gutierrez were in the pretext calls. He fully explored with Inisha the dispute between her and Gutierrez. (*See* 5–29–09 EHT at 195–97). He did not consider getting an investigator to just do a blanket investigation on Gutierrez. (*See* 5–29–09 EHT at 199–201).

*Re-cross Examination*

Robusto knew what the character witnesses' relationships to petitioner were be-cause he had talked to the family members and was given information regarding what these people were proposing to testify to. He inquired of Gutierrez regarding the Mexican Mafia to show there was no way petitioner could be a member as a teacher in the prisons at CYA. He believed he got the same information he might have gotten from the character witnesses. He argued it to the jury. He was never given the name Susan Rodriguez or David Delmar, or an address on Gold Street. If he had been, he would have had something to go on. With respect to Inisha's allegations, he did have in mind their admissibility. (*See* 5–29–09 EHT at 202–04).

The case was difficult to defend because all the relevant information—whether petitioner was involved in the plot—happened among the family. No outside witnesses could confirm or deny that the plot occurred, so you attack the person that is making the allegation, which is what he did. (*See* 5–29–09 EHT at 204–05).

*Further Examination by petitioner's counsel (July 24, 2009)*

Robusto is not a big note-taker; he does not take a lot of notes. He would take more notes when the issues are complex or confusing or different from other documents. (*See* Transcript of July 24, 2009 Evidentiary Hearing ["7–24–09 EHT"] at 8). Family interviews are reflected on pages 2 through 24 of his notes, from March 22, 2005. Where it says "can take investigator to Eric," that referred to someone Robusto was told loaned them money for the gun purchase. The notes indicate Gutierrez purchased the gun. No investigator went to speak to Eric. (*See* 7–24–09 EHT at 9–12). Robusto did not get a copy of the police report, which his notes reflect he wanted, because it was early in the case and he was just gathering information, not finalizing a tactic. (*See* 7–24–09 EHT at 14–16). Regarding a note re-

ferring to "Witness Hamilton knows where live," Robusto believes Hamilton knew where a witness lived who could provide information on the liquor store incident. (*See* 7–24–09 EHT at 18–19). He found the situations described by Inisha to be very confusing but did not take detailed notes. The notes reflect "ex-girlfriend bought her car" "he got back at her"; he did not know whether that referred to Frausto. (*See* 7–24–09 EHT at 20–21).

On page 240, which reflected a date of August 30, 2005, they were still in trial, and these were notes written by petitioner. The note says that Gutierrez had a car vandalized in front of the Barco residence that he held petitioner responsible for. (*See* 7–24–09 EHT at 24, 26–27). Robusto's theory was that it was more believable to argue that he was part and parcel of the murder than that he was upset about his $1000 or property or vandalized car; he viewed those as inconsistent. He could have presented both but chose not to. (*See* 7–24–09 EHT at 28–29). There were more discussions with the family than are reflected in the notes. His failure to record those interviews meant he did not think the information was important or he already had it. (*See* 7–24–09 EHT at 31–32).

*Further Examination by respondent's counsel*

Robusto does not take a lot of notes because it takes away from his ability to listen. He believes he has a good memory. He did not come across the names Laura Frausto or Michael Gabriel in his notes. (*See* 7–24–09 EHT at 37–39). He had learned earlier the same day he was supposed to meet with the investigator and the family that DeLosh could not work for him. (*See* 7–24–09 EHT at 40).

In this case, Judge Martinez ruled Gutierrez was not an accomplice at the end of the trial when instructions were given; Robusto wanted him ruled an accomplice or coconspirator because of corroboration requirements. He believes "cousin Eric" could have been found. The level of detail he got in information is reflected in the notes. He was never provided a list of Gutierrez's bad acts; it would have been in his notes. (*See* 7–24–09 EHT at 43–48). In Robusto's opinion, putting on evidence of the family law issues with the defense that Gutierrez was involved and trying to deflect blame would have cheapened the latter. (*See* 7–24–09 EHT at 49–50).

*The Court's Credibility Finding*

As a general matter, the Court found Robusto to be a generally credible witness. However, aspects of his evidentiary hearing testimony contradicted his deposition testimony and/or the notes from his trial file. Further, in the Court's view, Robusto offered less than credible explanations for his decision not to call character witnesses, as described in the Report and Recommendation.

3. *Petitioner's Strickland Expert*

**Stanley Perlo**

*Direct Examination*

Perlo has been a criminal defense attorney since 1974 who has been counsel in 200 murder cases and has tried between 25 and 50 of them. (*See* 5–29–09 EHT at 213–14).

Perlo sat through the testimony of all of the witnesses at the evidentiary hearing and is acquainted with written materials in the matter.[10] Perlo opined that the normal standards were not met in this case. (*See* 5–29–09 EHT at 218–19). First, it is standard practice to interview all witnesses. Defense counsel are required to

---

10. Perlo was the last witness to testify at the hearing.

disclose the names of all witnesses and their proposed statements 30 days prior to trial. Failure to do that in most cases will result in sanctions—almost never exclusion, but an admonition to the jury regarding the late disclosure. A defense lawyer never wants that instruction; you do not want the jury to think you are trying to hide something. Thus, when Robusto said he might have called those witnesses, if they had been allowed to testify at all, it would have probably come in with an admonition. (*See* 5–29–09 EHT at 220–21, 242). Further, in Perlo's view, not interviewing the character witnesses to learn how their testimony would come in—by way of opinion or reputation—puts the defense lawyer in the position of not even knowing what kind of tactics the prosecution could use if they were called, and not noticing them or subpoenaing them painted petitioner into a corner. (*See* 5–29–09 EHT at 223).

Perlo opined that Padilla was a necessary and viable witness, "tailor-made" for Robusto. He could dispel the Mexican Mafia connection given his several years in the CDC, had a multi-year history of petitioner, and knew him on a casual and business basis, and the phone calls played to Padilla were a "positive" for petitioner. (*See* 5–29–09 EHT at 222–24, 227–29, 235–36). Further, when you call a character witness, you get a very specific set of instructions that indicate that good character alone is sufficient to cause or create reasonable doubt. (*See* 5–29–09 EHT at 236). Perlo did not contest Robusto's "singular" decision to not call character witnesses in light of petitioner's decision not to testify; what he opined fell below "any standard" was the recommendation to not call character witnesses without having any basis for the recommendation, since he had no specific information on the witnesses and had not interviewed them.

(*See* 5–29–09 EHT at 238–39). Perlo stated that not calling Padilla, even if petitioner was not going to testify, was not in itself objectively unreasonable; rather, taken in context with the other issues—i.e., failure to investigate properly, failure to interview the character witnesses, failure to seek some way to attack Gutierrez—it was "wrong." (*See* 5–29–09 EHT at 240–41, 245). Perlo was not prepared to opine that it was objectively unreasonable not to call any character witness other than Padilla. (*See* 5–29–09 EHT at 245–46).

Perlo opined that because no investigation was done, trial counsel found "absolutely nothing," while appellate counsel found "reams and reams" of evidence in a short period of time. Since Gutierrez was the centerpiece of the defense, evidence regarding his propensity for violence or retaliatory behavior would have fit into the defense Robusto wanted to put forward. This evidence should have been discovered months earlier by Robusto, and his failure to effectively investigate the case put the defense in a position of having a very limited choice of weapons. (*See* 5–29–09 EHT at 229–30, 233).

Perlo opined that it was objectively unreasonable not to call Michael Gabriel because he was a witness who could cast doubt on the behavior and testimony of Gutierrez. Gutierrez's attempt to sell marijuana at a party, even if a minor offense, is still unlawful. Gabriel's testimony regarding Gutierrez's retaliation talk/threat was direct testimony indicated exactly what Robusto had said was prime to his defense—that Gutierrez was a participant in the crime. Gabriel's testimony served the stated defense and allowed the jury to draw conclusions about Gutierrez's lack of candor and act of moral turpitude. (*See* 5–29–09 EHT at 246–48).

Perlo is not sure Robusto had any choice regarding whether to call Marivel in light

of her assertion of marital privilege. (*See* 5–29–09 EHT at 248). Given the state of the evidence today, Perlo opined that it was objectively unreasonable not to call Inisha, even considering possible lines of impeachment based on inconsistent statements. She provided the one link to attack Gutierrez and could have testified to the break-in, which was corroborated by the police officer, and the gas station incident, which showed Gutierrez's propensity for violence and retribution. (*See* 5–29–09 EHT at 252–53, 255–56, 259–60). Perlo opined that Laura Frausto was an absolutely necessary witness to show Gutierrez's retributive behavior. (*See* 5–29–09 EHT at 260–61). Perlo opined, though, that once you have two witnesses, it would not be unreasonable to reevaluate whether to call a third witness. (*See* 5–29–09 EHT at 262).

*Cross–Examination*

Perlo did not review Inisha's video-taped interview with police or hear any audiotapes other than what was played in this Court. (*See* 5–29–09 EHT at 264–65). Perlo received a $5,000 flat fee for his review and testimony in this case. (*See* 5–29–09 EHT at 268).

Perlo did not find that Robusto's failure to call Scroggins, Francis, or Martinez fell below the standard. (*See* 5–29–09 EHT at 270). Regarding the playing of the tape with Padilla, Perlo found it to be a win-win situation. (*See* 5–29–09 EHT at 271). Perlo agreed with Robusto that putting on the character witnesses would have given the prosecution the opportunity to rebuild its case, but found it inappropriate for Robusto to consider that in isolation. (*See* 5–29–09 EHT at 276). Regarding the gas station incident, Robusto should have done more investigation; if possible, he should have investigated every gas station in Riverside if he only knew that the incident

had happened at a gas station in Riverside in the last year. (*See* 5–29–09 EHT 286).

*The Court's Credibility Finding*

The Court found Perlo to be a generally credible witness. Further, the Court does attach some weight to Perlo's opinions as indicated in the Report and Recommendation.